[No. 51145-4.  En Banc.  June 6, 1985.]

SEATTLE RENDERING WORKS, INC., ET AL, *Respondents,*
v. DARLING–DELAWARE COMPANY, INC.,
*Appellant.*

*Kafer, Good, St. Mary & Mitchell* and *Randall L. St. Mary (David S. Acker* and *Winston & Stawn,* of counsel), for appellant.

*Reaugh & Prescott,* by *Richard Oettinger,* and *Gordon, Thomas, Honeywell, Malanca, Peterson & O'Hern,* by *Mark Honeywell,* for respondents.

DORE, J.—We hold that a judicial opinion of a trial judge not formalized by judgment which is predicated upon a statute which was repealed in the interim period between the opinion and judgment is void. We further hold that a plaintiff in a suit for below–cost pricing must prove that the defendant had a substantial share of the market and had set his retail price below his average variable cost in order to establish price fixing. We reverse and dismiss plaintiffs' cause of action because the trial court entered judgment for plaintiffs based on a repealed statute and finding that defendant had priced its product below total cost rather than average variable cost. In addition, plaintiffs failed to establish that defendants had a substantial share of the market.

### FACTS

This case involves the rendering industry in Western Washington. Rendering involves the collection of raw materials such as animal fat, bone, offal and grease from packing houses, slaughterhouses, grocery stores, butcher shops and restaurants. These raw materials are cooked and refined to produce two basic products: tallow and meat

meal. Most of the tallow is sold in export while the meat meal is sold domestically as a supplement to animal feed. A renderer can obtain raw material in two ways: it can collect the raw material itself or it can pay a "peddler" which will collect and deliver raw material to the rendering plant.

The defendant here, Darling–Delaware Co. (Darling), owns a rendering plant in Tacoma (Darling–Tacoma) which employs both methods for obtaining raw material. Darling, as of the time of this suit, had sustained losses at its Tacoma plant in 5 of the previous 6 fiscal years. Plaintiff Seattle Rendering Works, Inc. (Seattle) is also a renderer and uses both methods to obtain raw materials. The other plaintiff, Johnson Manufacturing, Inc. (Johnson), is a "peddler" that formerly supplied Darling–Tacoma with raw materials but now supplies Seattle. There are three predominant rendering companies in Western Washington: (1) Seattle, (2) Darling–Tacoma, and (3) Pacific Rendering. Seattle is the largest of the three.

Prior to 1982, Darling–Tacoma and Johnson had an agreement wherein Johnson agreed to deliver all of the raw materials it collected to Darling–Tacoma. That contract expired on January 2, 1982. During 1981, Johnson provided 20 to 25 percent of all raw material processed by Darling–Tacoma. As the expiration time of the contract approached, Darling made an unsuccessful attempt to purchase all of the assets and goodwill of Johnson. During the negotiations, Darling–Tacoma raised its processing charge to Johnson from $2.40 to $2.75 per hundred pounds of raw material.

On February 8, 1982, following Darling's unsuccessful attempt to purchase Johnson and Darling–Tacoma's increase of Johnson's processing charge, Johnson entered into a contract with Seattle wherein Johnson agreed to deliver all the raw materials it collected to Seattle. Seattle, in turn, agreed to process Johnson's raw material for only $2.20 per hundred pounds. Darling, attempting to replace the raw material formerly supplied by Johnson, initiated an aggressive purchasing campaign. The campaign consisted of

contacting large numbers of Seattle's and Johnson's raw material suppliers and offering them a premium price for their raw material.[1]

Darling's campaign produced results. One of Seattle's suppliers which Darling–Tacoma secured as a result of its price raise was Wheeler's Cold Storage. Wheeler supplied 68,176 pounds of mixed fat and bones to Darling–Tacoma from the last week of February 1982 through July 1982. Another of Johnson's suppliers which was secured by Darling–Tacoma was Florence Meat Packing. Florence previously had been supplying approximately one–fourth of Johnson's raw tonnage.

Shortly after Darling–Tacoma instituted its new pricing policy, both plaintiffs sought a temporary restraining order. It was granted on March 5, 1982. The order prohibited Darling–Tacoma from contacting any supplier of plaintiffs. Nor could it accept any raw material from any supplier which was, as of March 5, 1982, a supplier of either plaintiff. On April 15, 1982, a preliminary injunction was entered prohibiting Darling–Tacoma from contacting or accepting delivery of raw materials from a supplier of either plaintiff. When this cause of action was brought to trial, the court found for the plaintiffs. The court awarded plaintiffs nominal damages of $1 trebled to $3. In addition, it imposed a permanent injunction against Darling–Tacoma prohibiting it from engaging in its pricing policies. The trial court relied on two bases of authority for its judgment in favor of the plaintiffs: a violation of the Unfair Practices Act and a violation of the Consumer Protection Act. Darling appeals here.

---

[1]Column A represents the price Darling–Tacoma was offering its average typical accounts and column B represents the price it was offering its larger premium accounts at the time of Johnson's departure. Column C represents the price offered to both accounts within a week after Johnson's departure.

| Raw Material | A | B | C |
|---|---|---|---|
| Shop bone | $1.01–$1.56 (cwt.) | —— | $5.00 (cwt.) |
| Shop fat | $4.41–$4.55 (cwt.) | —— | $8.00 (cwt.) |
| Mixed bone & fat | $3.35 (cwt.) | $3.50 or $5.50 (cwt.) | $6.50 (cwt.) |

## Unfair Practices Act

The trial court found that Darling had violated the Unfair Practices Act (UPA), RCW 19.90. The UPA prohibited a seller from selling its product below what it cost the seller to either make or obtain that product. The UPA, however, was repealed before the trial court had entered written judgment for plaintiffs.

A repealing act terminates all rights dependent upon the repealed statute and all proceedings based on it. *Lau v. Nelson,* 89 Wn.2d 772, 575 P.2d 719 (1978), *partially overruled on other grounds in Roberts v. Johnson,* 91 Wn.2d 182, 588 P.2d 201 (1978). This court has stated that a repealing act will terminate a cause of action even after oral judgment has been entered:

> It is even held that a repeal after judgment, but before entry of judgment, works a discontinuance of the suit, and that a repeal pending an appeal to the higher court charged the appellate court with the duty of declaring the litigation ended without right of further prosecution.

*Ettor v. Tacoma,* 57 Wash. 50, 55, 106 P. 478, 107 P. 1061 (1910), *rev'd on other grounds,* 228 U.S. 148, 57 L. Ed. 773, 33 S. Ct. 428 (1913). *Accord, Governing Bd. of Rialto Unified Sch. Dist. v. Mann,* 18 Cal. 3d 819, 558 P.2d 1, 135 Cal. Rptr. 526 (1977); *Dickson v. Navarro Cy. Levee Imp. Dist. 3,* 135 Tex. 95, 139 S.W.2d 257 (1940). The repeal of a statute, however, does not destroy vested rights "or rights of a common–law nature which are further embodied in the repealed statute, the latter existing independently as enforceable rights." *Lau v. Nelson, supra* at 774. A cause of action for below–cost pricing is not a right found at common law. Accordingly, we hold the plaintiffs' judgment based on the Unfair Practices Act is void.

## Consumer Protection Act

The second basis of authority upon which the trial court relied for finding for the plaintiffs was the Consumer Protection Act (CPA), RCW 19.86. The trial court, using the UPA violation, found a per se violation of the CPA. In

addition, it found a non–per se violation as well. Since the UPA has been repealed, it cannot be used as the basis for a per se violation of the CPA. Consequently, the only basis left, upon which the trial court relied, is a non–per se violation of the CPA. In order for a private party to recover under a non–per se violation of the CPA, he must show that:

> (1) the defendant by unfair or deceptive acts or practices in the conduct of trade or commerce has induced the plaintiff to act or refrain from acting; (2) *the plaintiff suffers damage* brought about by such action or failure to act; and (3) the defendant's deceptive acts or practices have the potential for repetition.

(Italics ours.) *Anhold v. Daniels,* 94 Wn.2d 40, 46, 614 P.2d 184 (1980). Here, the trial court found that the plaintiffs did not suffer any damages. Consequently, the plaintiffs have failed to meet the requirement of damages set forth in *Anhold.* Thus, the trial court's finding of a violation of the CPA cannot be sustained.

Finally, we note that there is one more possible basis upon which a judgment in favor of plaintiffs may have been upheld. The act which repealed the UPA, the Antitrust/Consumer Protection Improvements Act, specifically stated that

> chapter 19.86 RCW should continue to provide appropriate remedies for predatory pricing and other pricing practices *which constitute violations of federal antitrust law.*

(Italics ours.) Laws of 1983, ch. 288, § 1, p. 1403. *See also* RCW 19.86.920 ("It is the intent of the legislature that, in construing this act, the courts be guided by final decisions of the federal courts . . . interpreting the various federal statutes dealing with the same or similar matters . . ."). Accordingly, we would find a below–cost pricing violation under the CPA if the activity complained of violated federal antitrust law.

There is no question that below–cost pricing is a

violation of federal antitrust law.[2] *See, e.g., Transamerica Computer Co. v. IBM Corp.*, 698 F.2d 1377 (9th Cir.), *cert. denied*, 464 U.S. 955 (1983). In determining whether a price is predatory, courts look to the relation between the cost of producing a product and the price charged for it. *IBM Corp.*, at 1384. In determining the relevant cost of producing a product, Courts of Appeals for the various circuits have substantially adopted the standard set forth in 1975 by Professors Areeda and Turner. *See* Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv. L. Rev. 697 (1975).[3] In short, Areeda and Turner assert that a company that sets its price above its marginal cost[4] should be presumed to be acting in

---

[2]We note that this is not a traditional below–cost pricing case. The usual below–cost pricing case involves a firm lowering its price so that the new price it is offering for its product is below what it cost to make that product. The facts presented here are different in that the price of the finished product stayed the same but the cost of the raw materials needed to make the product rose. Analytically, this distinction is irrelevant.

[3]*See Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 729 F.2d 1050 (6th Cir.), *cert. denied*, 105 S. Ct. 511 (1984); *Adjusters Replace–A–Car, Inc. v. Agency Rent–A–Car, Inc.*, 735 F.2d 884 (5th Cir. 1984), *cert. denied*, 105 S. Ct. 910 (1985); *Transamerica Computer Co. v. IBM Corp.*, 698 F.2d 1377 (9th Cir.), *cert. denied*, 464 U.S. 955 (1983); *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227 (1st Cir. 1983); *Northeastern Tel. Co. v. AT&T Co.*, 651 F.2d 76 (2d Cir. 1981), *cert. denied*, 455 U.S. 943 (1982); *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.*, 615 F.2d 427 (7th Cir. 1980); *Pacific Eng'g & Prod. Co. v. Kerr–McGee Corp.*, 551 F.2d 790 (10th Cir.), *cert. denied*, 434 U.S. 879 (1977).

[4]Costs are divided into "fixed costs" and "variable costs". Fixed costs are costs that do not vary with changes in output, *e.g.*, most management expenses, interest on bonded debt, depreciation (to the extent that equipment is not consumed by using it), property taxes, and other irreducible overhead. In short, fixed costs are costs that would continue even if the firm produced no output at all. Variable costs vary with changes in output, *e.g.*, materials, fuel, labor directly used to produce the product, indirect labor such as foreman, clerks, and custodial help, utilities, repair maintenance, and per unit royalties and license fees. Marginal cost is the increment to total cost that results from producing an additional increment of output. Average total cost is obtained by dividing total cost by output. Similarly, average variable cost is the sum of all variable costs divided by output. Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv. L. Rev. 697, 700–01 (1975).

a reasonable manner whereas a company that sets its price below its marginal cost should be presumed to be doing so for an unlawful reason, *i.e.*, driving out competitors so that it can later assert monopoly power and hence reap monopoly profits. Areeda and Turner conclude that since marginal cost is difficult or impossible to compute, average variable cost should be used as a proxy.

In addition to examining a defendant's average variable cost, some federal courts also require the plaintiff to show that the defendant had a substantial share of the market, *Transamerica Computer Co. v. IBM Corp.*, 698 F.2d 1377 (9th Cir.), *cert. denied*, 464 U.S. 955 (1983), or that entry barriers to the market existed, *Adjusters Replace–A–Car, Inc. v. Agency Rent–A–Car, Inc.*, 735 F.2d 884 (5th Cir. 1984), *cert. denied*, 105 S. Ct. 910 (1985), or that the defendant had a predatory intent in setting its price below its cost, *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.*, 615 F.2d 427 (7th Cir. 1980); *Pacific Eng'g & Prod. Co. v. Kerr–McGee Corp.*, 551 F.2d 790 (10th Cir.), *cert. denied*, 434 U.S. 879 (1977). We find that plaintiffs failed to prove a below–cost pricing violation.

The trial court never made a finding as to whether the price Darling–Tacoma paid for raw materials caused it to sell its finished product below average variable cost. What little evidence presented at trial regarding average variable cost was favorable to Darling–Tacoma. Dr. Lloyd Bassett, a professor of economics at the University of Washington, testified that Darling–Tacoma's increase in the price it paid for raw materials did not cause it to sell its finished product below its average variable cost. Dr. Bassett testified that, in his opinion, the pricing was not a violation under the Areeda and Turner analysis.[5] Moreover, other factors employed by the federal courts do not enhance the plaintiffs' position. First, it is unknown whether Darling–

---

[5]The only other testimony presented concerning average variable cost was given by Darling–Tacoma's comptroller. His testimony is inconclusive as it was elicited by way of a hypothetical.

Tacoma had a substantial share of the market. While Darling–Tacoma concedes that there are three predominant renderers and two "peddlers" in Western Washington, it is unknown what share each of the five dominant companies has in collecting the available raw material. Second, there was no evidence presented that there are any entry barriers in the rendering market. Third, Darling–Tacoma did not appear to have any predatory intent when it raised the price it was willing to pay for raw materials. Darling–Tacoma was only attempting to compensate for the raw material which Johnson used to supply. This was a substantial amount: 20 to 25 percent of its previous year's raw material. To accomplish this, it needed to raise the price it was offering to pay for raw materials in order to attract a selling market for such materials. Raw materials being relatively scarce (all raw materials in the area were already used by all the rendering companies in the area), it had to raise its price substantially to attract sellers if it was to stay in business.

## CONCLUSION

In summary, we find no basis upon which to uphold the trial court's decision. We reverse and dismiss plaintiffs' judgment for nominal damages, an injunction, and attorney fees.

DOLLIVER, C.J., UTTER, BRACHTENBACH, PEARSON, ANDERSEN, GOODLOE, and DURHAM, JJ., and CUNNINGHAM, J. Pro Tem., concur.

Reconsideration denied July 24, 1985.