[No. 51213–2. En Banc. May 8, 1986.]

HANGMAN RIDGE TRAINING STABLES, INC., ET AL, *Respondents,* v. SAFECO TITLE INSURANCE COMPANY, *Appellant.*

*Witherspoon, Kelley, Davenport & Toole, P.S.,* by *Kristine A. Chrey,* for appellant.

*Evans, Craven & Lackie, P.S.,* by *Constance D. Gould,* for respondents.

BRACHTENBACH, J.—This case involves the Consumer Protection Act. The precise issue presented is whether the defendant title insurance company, acting as escrow agent, may be assessed attorney fees in a private CPA action when plaintiffs have not established that defendant engaged in an unfair or deceptive act, or that plaintiffs were in fact injured, or that defendant's conduct caused such alleged injury, or that the defendant's conduct had an impact on the public interest. We hold that to prevail in a private CPA action and therefore be entitled to attorney fees, a plaintiff must establish five distinct elements: (1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; (5) causation. Because plaintiffs here have failed to establish the first, third, fourth, and fifth elements, they have not prevailed, and are not entitled to attorney fees. The judgment of the trial court which awarded attorney fees to plaintiffs is reversed.

The plaintiffs, Mr. and Mrs. McNeil, were the sole shareholders in a corporation, Hangman Ridge Training Stables, Inc. Sometime prior to March 1978, the McNeils

found themselves in desperate financial straits. They had not filed corporation or individual tax returns for several years. A federal tax lien and a judgment had been filed against them, and the corporation's contract seller of certain real estate had given notice of intent to declare a forfeiture.

In an attempt to ease these financial pressures, the McNeils applied to the Farmers Home Loan Administration (FHLA) for a loan. The FHLA agreed to the loan but insisted upon a security interest in the real estate then being purchased under contract by Hangman Ridge and a transfer of the property to the McNeils individually. Accordingly, the closing of the loan included conveyance of the subject property from Hangman Ridge to the McNeils by quitclaim deed.

Prior to the closing, the FHLA agent told the McNeils that it might be necessary for them to seek legal assistance regarding the transaction. The McNeils never did so, although they retained an attorney and an accountant on a regular basis. Their accountant, in fact, had advised them earlier that the corporation was not advantageous to them and should be dissolved.

The quitclaim deed conveying the corporation's interest to the McNeils was prepared by the escrow agent, and the closing was performed in March 1978 by Safeco Title Insurance Company, which had been designated by FHLA as the escrow closer. The Safeco closing agent told the parties she was not an attorney, but she provided no information regarding any need to consult independent counsel or obtain tax advice.

Approximately 1 year after the closing, the McNeils' attorney discovered that the tax liability resulting from the transfer of the deed amounted to approximately $3,500. Plaintiffs contend this liability could have been avoided had the Safeco closing agent warned the McNeils about the potential tax consequences before the deed was transferred. The McNeils, individually and as Hangman Ridge, then sued Safeco. They alleged that the loan closing and deed

preparation constituted the unauthorized practice of law and that such conduct supported both a CPA and legal malpractice action.

Trial was held to the court in December 1980. The trial judge essentially found that Safeco's deed preparation and loan closing amounted to the unauthorized practice of law, but that such conduct did not support a legal malpractice action or constitute a CPA violation.

The trial court found that the standard of care was the same for attorneys and nonattorneys who prepare deeds and close real estate transactions. Based upon conflicting evidence, the court found that such standard did not require "across the board" tax advice. The conflicting testimony which attempted to establish such higher standard was described by the trial judge as "meager." This led to a conclusion of law that the plaintiffs had failed to establish a standard of care which required the defendant to advise plaintiffs of the possible tax ramifications of the quitclaim deed or to refer the matter to a tax expert.

The court concluded that: (1) defendant did not breach any duty owed to plaintiffs; (2) the defendant did not cause any damage to plaintiffs; (3) defendant's actions were not unfair or deceptive; and (4) the alleged harm and alleged damage were not reasonably foreseeable. As a result of these conclusions, the trial court awarded neither an injunction nor attorney fees.

Plaintiffs appealed first to the Court of Appeals, which affirmed the trial court. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 33 Wn. App. 129, 652 P.2d 962 (1982). They then petitioned this court for review. The petition was granted in January 1983, but was continued, pending the disposition of *Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 675 P.2d 193 (1983), which raised similar issues. *Bowers* was decided in December 1983, and in March 1984, this court remanded *Hangman Ridge* to the Court of Appeals with instructions to reconsider in light of *Bowers*. The Court of Appeals then remanded to the trial court, with the same instructions.

Upon remand, the trial judge found the unauthorized practice of law in this case constituted a "per se CPA violation," although he found the McNeils had not been injured. Nevertheless, he enjoined Safeco from performing closings except in strict compliance with current Admission to Practice Rule 12, and he awarded approximately $45,000 to the McNeils in attorney fees, expert witness fees, and costs. Safeco appeals from the finding of a CPA violation and award of attorney fees.

Because this case involves a highly confused area of the law, we have chosen it as a vehicle for clarification of the private right of action under the CPA. Pursuant to such clarification, we first set forth a brief history of state consumer protection law. Second, we focus on the elements of a private cause of action, with emphasis on the public interest requirement. Finally, we apply these elements to the facts of this case.

I

In the 1950's and 1960's, individual states began to enact consumer protection laws. These acts were generally modeled after section 5 of the Federal Trade Commission Act (codified in 1938 as 15 U.S.C. § 45(a)(1)) which was adopted by Congress to protect United States citizens against unfair trade practices. *See generally* Note, *Toward Greater Equality in Business Transactions: A Proposal To Extend the Little FTC Acts to Small Businesses,* 96 Harv. L. Rev. 1621 (1983). Washington, along with Rhode Island, New York, and Alaska, led the states in enacting consumer protection legislation. Lovett, *Private Actions for Deceptive Trade Practices,* 23 Ad. L. Rev. 271, 275 (1971).

In 1961, the Washington Legislature adopted RCW 19.86.020, which provides:

Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

The purpose of the Washington CPA was set forth in RCW 19.86.920. That section reveals the Legislature's

intent "to protect the public and foster fair and honest competition." To that end, the Attorney General was given enforcement powers under the act. By 1971, Washington was recognized as having one of the best and most successful enforcement programs in the country, with a higher proportion of claims to population than any other state in the nation. 23 Ad. L. Rev., at 287.

In apparent response to the escalating need for additional enforcement capabilities, the State Legislature in 1971 amended the CPA to provide for a private right of action whereby individual citizens would be encouraged to bring suit to enforce the CPA. RCW 19.86.090, as amended, first in 1971 and again in 1983, provides in relevant part:

> Any person who is injured in his business or property by a violation of RCW 19.86.020 . . . may bring a civil action . . . to enjoin further violations, to recover . . . actual damages . . . or both, together with the costs of the suit, including a reasonable attorney's fee, and the court may in its discretion . . . award . . . three times the actual damages . . . not [to] exceed ten thousand dollars . . .

After private individuals began to pursue their remedies under this section, we construed the language of all three of the foregoing sections, RCW 19.86.020, .920, and .090, to require a showing that the public interest would be served by each private plaintiff's lawsuit. *See Lightfoot v. MacDonald*, 86 Wn.2d 331, 544 P.2d 88 (1976).

Since the *Lightfoot* decision, the confusion surrounding private rights of action under the CPA has steadily increased. In the past, private plaintiffs have been required to establish only three separate elements: (1) an unfair or deceptive act or practice; (2) in trade or commerce; (3) which affects the public interest. *See Anhold v. Daniels*, 94 Wn.2d 40, 614 P.2d 184 (1980). Hereafter, five elements, all statutorily based, must be established by a plaintiff in order that he or she prevail under a private CPA action. The first three elements remain, although the public interest element is substantially changed. The fourth

105 Wn.2d p. 784, lines 10 & 13 The year "1971" should be
 "1970"
 p. 896, line 17 The word "comments" should
 be "contents of"

requires a showing of injury to plaintiff in his or her business or property. The fifth requires that a causal link be established between the unfair or deceptive act complained of and the injury suffered. Each of these five elements will be discussed in turn and ultimately applied to the particular facts of this case.

## II

■ The first element of a private CPA action is an unfair or deceptive act or practice. RCW 19.86.020. A plaintiff need not show that the act in question was *intended* to deceive, but that the alleged act had the *capacity* to deceive a substantial portion of the public. *State v. Ralph Williams' North West Chrysler Plymouth, Inc.,* 87 Wn.2d 298, 553 P.2d 423 (1976), *appeal dismissed,* 430 U.S. 952 (1977); *Testo v. Russ Dunmire Oldsmobile, Inc.,* 16 Wn. App. 39, 554 P.2d 349, 83 A.L.R.3d 680 (1976); *Haner v. Quincy Farm Chems., Inc.,* 97 Wn.2d 753, 649 P.2d 828 (1982). The purpose of the capacity–to–deceive test is to deter deceptive conduct *before* injury occurs. *See* 60 Wash. L. Rev. 925, 944 (1985).

The second element which a private plaintiff must establish is that the act or practice complained of occurred in the conduct of trade or commerce. RCW 19.86.020. The Legislature has broadly defined the terms "trade" and "commerce" to include "the sale of assets or services, and any commerce directly or indirectly affecting the people of the state of Washington." RCW 19.86.010(2). This court continues to give effect to the intended broad construction of these terms.

> The CPA, on its face, shows a carefully drafted attempt to bring within its reaches *every* person who conducts unfair or deceptive acts or practices in *any* trade or commerce.

*Short v. Demopolis,* 103 Wn.2d 52, 61, 691 P.2d 163 (1984).

■ The above two elements may be established by a showing that (1) an act or practice which has a capacity to deceive a substantial portion of the public (2) has occurred

in the conduct of any trade or commerce. Alternatively, these two elements may be established by a showing that the alleged act constitutes a per se unfair trade practice. A per se unfair trade practice exists when a statute which has been declared by the Legislature to constitute an unfair or deceptive act in trade or commerce has been violated.

We first used the term "per se unfair trade practice" in *State v. Reader's Digest Ass'n,* 81 Wn.2d 259, 501 P.2d 290 (1972), *appeal dismissed,* 411 U.S. 945 (1973). There we found that the Reader's Digest Sweepstakes was a lottery. Since lotteries were prohibited by both statute and state constitution, such lotteries were unfair. "What is illegal and against public policy is per se an unfair trade practice." *Reader's Digest,* at 270.

To the extent that our opinion in *Reader's Digest* suggests that this court will declare conduct which is "illegal" and "against public policy" to be a per se unfair trade practice, it is modified. There are two reasons for this modification. First, the use of the term "public policy" is a reference to "public interest". *Reader's Digest* predated our decisions in both *Lightfoot* (1976) and *Anhold* (1980), in which we focused on public interest and made it a specific element of a CPA action. Thus, "public policy" in the context of an "unfair trade practice" has been replaced by a separate public interest requirement.

Second, since our decision in *Reader's Digest* in 1972, the interaction between certain "illegal" conduct and the CPA has begun to be designated by the Legislature itself. In recent years, state lawmakers have specifically declared the violation of many consumer protection statutes to constitute "an unfair or deceptive act in trade or commerce", or "unfair trade practice". Examples of such statutes include: RCW 19.09.340 (charitable solicitations) (1973); RCW 19.105.500 (camping clubs) (1982); RCW 19.102.020 (chain distribution schemes) (1973); RCW 19.110.170 (business opportunities) (1981); RCW 18.28.185 (debt adjustment) (1979); RCW 18.39.350 (embalming) (1982); RCW 58.19.270 (land development) (1973); RCW 63.10.050 (consumer

leases) (1983); RCW 64.36.170 (time–share offerings) (1983).

Our decision in *Reader's Digest* attempted to recognize the interaction of a statute prohibiting lotteries and the CPA. Since that time, it has become clear that the Legislature, not this court, is the appropriate body to establish that interaction by declaring a statutory violation to be a per se unfair trade practice. Where the Legislature specifically defines the exact relationship between a statute and the CPA, this court will acknowledge that relationship.

The third element is that of a public interest showing. We first required such a showing of private plaintiffs in *Lightfoot v. MacDonald, supra.* Since the time of *Lightfoot,* our public interest requirement has been subject to harsh criticism. *See generally* Comment, *Private Suits Under Washington's Consumer Protection Act: The Public Interest Requirement,* 54 Wash. L. Rev. 795 (1979); Comment, *The Consumer Protection Act Private Right of Action: A Reevaluation,* 19 Gonz. L. Rev. 673 (1984); 60 Wash. L. Rev. 201 (1984). Indeed, Washington is very clearly in the minority in requiring a public interest showing of a private plaintiff.

As of 1980, 42 states allowed a private right of action. Leaffer & Lipson, *Consumer Actions Against Unfair or Deceptive Acts or Practices: The Private Uses of Federal Trade Commission Jurisprudence,* 48 Geo. Wash. L. Rev. 521 (1980). Of these 42 states, only 6 have ever required a public interest showing of a private plaintiff under any circumstances. Connecticut, for example, followed a judicially created public interest requirement until 1984 (*see Ivey, Barnum & O'Mara v. Indian Harbor Properties, Inc.,* 190 Conn. 528, 461 A.2d 1369 (1983)), when the Connecticut Legislature specifically eliminated the public interest showing required by *Ivey. See Collins v. Gulf Oil Corp.,* 605 F. Supp. 1519 (D. Conn. 1985); *Carpentino v. Transport Ins. Co.,* 609 F. Supp. 556 (D. Conn. 1985). New York and Illinois courts have concerned themselves with a public interest requirement, but those states apparently have

developed no uniform application of such requirement. *See Genesco Entertainment v. Koch,* 593 F. Supp. 743 (S.D.N.Y. 1984); *Newman–Green, Inc. v. Alfonzo–Larrain R.,* 590 F. Supp. 1083, 1087 (N.D. Ill. 1984) ("Any 'public injury' requirement is not uniformly applied in Illinois"). Hawaii requires a public interest showing in all private actions where the defendant is not a merchant. *See Ai v. Frank Huff Agency, Ltd.,* 61 Hawaii 607, 607 P.2d 1304 (1980); *Beerman v. Toro Mfg. Corp.,* 1 Hawaii App. 111, 615 P.2d 749 (1980); *Ailetcher v. Beneficial Fin. Co.,* 2 Hawaii App. 301, 632 P.2d 1071 (1981). However, only Washington and Georgia unequivocally require a showing by all private plaintiffs of public interest impact. *See Zeeman v. Black,* 156 Ga. App. 82, 273 S.E.2d 910 (1980); *Benchmark Carpet Mills, Inc. v. Fiber Indus., Inc.,* 168 Ga. App. 932, 311 S.E.2d 216 (1983); *Waller v. Scheer,* 175 Ga. App. 1, 332 S.E.2d 293 (1985).

█ In observing the prevailing practices in other jurisdictions regarding a public interest requirement in private actions, we are mindful that we follow a minority view. We are also aware of the general criticism that a public interest requirement is unnecessarily restrictive as to private plaintiffs. Nevertheless, we continue to adhere to our position. Such adherence is mandated by two considerations. First, the purpose section of the CPA, as set forth in RCW 19.86-.920, states, in relevant part:

It is . . . the intent of the legislature that this act shall not be construed to prohibit acts or practices which . . . are not injurious to the public interest . . .

This language expresses a clear intent to protect the general public by means of the CPA as a whole. An act is to be construed as a whole. *Burlington Northern, Inc. v. Johnston,* 89 Wn.2d 321, 326, 572 P.2d 1085 (1977). Although the specific section creating a private right of action does not mention public interest, we are compelled to interpret RCW 19.86 in its entirety and conclude that the Legislature intended that even a private plaintiff should be required to show that the acts complained of affect the public interest.

Second, the Legislature, in the 10 years since we first construed the CPA in *Lightfoot v. MacDonald,* 86 Wn.2d 331, 544 P.2d 88 (1976) to require a public interest showing, has taken no action to eliminate such a requirement. We presume the Legislature is familiar with past judicial interpretations of its enactments. *Glass v. Stahl Specialty Co.,* 97 Wn.2d 880, 887, 652 P.2d 948 (1982); *Ballinger v. Department of Social & Health Servs.,* 104 Wn.2d 323, 329, 705 P.2d 249 (1985). Legislative inaction in this instance indicates legislative approval of the public interest showing required of private CPA plaintiffs. Additionally, we observe that such acquiescence is in sharp contrast to the legislative action taken in Connecticut. As previously noted, Connecticut lawmakers amended that state's CPA in 1984 to remove a judicially created public interest requirement.

Being thus compelled to a continuing minority position in requiring such a showing, we clarify this third element.

Currently the public interest element may be met in one of two ways: public interest impact may be established via a 3-prong test announced in *Anhold v. Daniels,* 94 Wn.2d 40, 614 P.2d 184 (1980), or the violation may satisfy the public interest element per se. *Sato v. Century 21 Ocean Shores Real Estate,* 101 Wn.2d 599, 681 P.2d 242 (1984).

The *Anhold* method requires proof that:

> (1) the defendant by unfair or deceptive acts or practices in the conduct of trade or commerce has induced the plaintiff to act or refrain from acting; (2) the plaintiff suffers damage brought about by such action or failure to act; and (3) the defendant's deceptive acts or practices have the potential for repetition.

*Anhold,* at 46. It has become clear that this "inducement–damage–repetition" test is not the best vehicle for showing that the public was or will be affected by the act in question. Accordingly, private plaintiffs need no longer meet the three prongs of this test. Instead, whether the public has an interest in any given action is to be determined by the trier of fact from several factors, depending upon the context in

which the alleged acts were committed. Where the transaction was essentially a consumer transaction, *see, e.g., Haner v. Quincy Farm Chems., Inc.,* 97 Wn.2d 753, 649 P.2d 828 (1982) (plaintiff farmer purchased defective wheat seed); *Lidstrand v. Silvercrest Indus.,* 28 Wn. App. 359, 623 P.2d 710 (1981) (plaintiff purchased defective mobile home); *Dempsey v. Joe Pignataro Chevrolet, Inc.,* 22 Wn. App. 384, 589 P.2d 1265 (1979) (plaintiff purchased new automobile with defective paint job); *Testo v. Russ Dunmire Oldsmobile, Inc.,* 16 Wn. App. 39, 554 P.2d 349, 83 A.L.R.3d 680 (1976) (plaintiff purchased defective used automobile), these factors are relevant to establish public interest: (1) Were the alleged acts committed in the course of defendant's business? (2) Are the acts part of a pattern or generalized course of conduct? (3) Were repeated acts committed prior to the act involving plaintiff? (4) Is there a real and substantial potential for repetition of defendant's conduct after the act involving plaintiff? (5) If the act complained of involved a single transaction, were many consumers affected or likely to be affected by it?

 Where the transaction was essentially a private dispute (*see, e.g., Lightfoot v. MacDonald, supra* (attorney–client); *Short v. Demopolis,* 103 Wn.2d 52, 691 P.2d 163 (1984) (attorney–client); *Salois v. Mutual of Omaha Ins. Co.,* 90 Wn.2d 355, 581 P.2d 1349 (1978) (insurer–insured); *McRae v. Bolstad,* 101 Wn.2d 161, 676 P.2d 496 (1984) (realtor–property purchaser); *Bowers v. Transamerica Title Ins. Co.,* 100 Wn.2d 581, 675 P.2d 193 (1983) (escrow closing agent–client)), it may be more difficult to show that the public has an interest in the subject matter. Ordinarily, a breach of a private contract affecting no one but the parties to the contract is not an act or practice affecting the public interest. *Lightfoot v. MacDonald, supra* at 334. However, it is the likelihood that additional plaintiffs have been or will be injured in exactly the same fashion that changes a factual pattern from a private dispute to one that affects the public interest. *McRae v. Bolstad, supra* at 166. Factors indicating public interest in this context include: (1) Were

the alleged acts committed in the course of defendant's business? (2) Did defendant advertise to the public in general? (3) Did defendant actively solicit this particular plaintiff, indicating potential solicitation of others? (4) Did plaintiff and defendant occupy unequal bargaining positions? As with the factors applied to essentially consumer transactions, not one of these factors is dispositive, nor is it necessary that all be present. The factors in both the "consumer" and "private dispute" contexts represent indicia of an effect on public interest from which a trier of fact could reasonably find public interest impact.

In addition to the above method of establishing public interest, which replaces the *Anhold* 3–prong test, the public interest element may be satisfied per se. The per se method requires a showing that a statute has been violated which contains a specific legislative declaration of public interest impact. In *Haner v. Quincy Farm Chems., Inc., supra* at 762, we stated the rule, which has continuing validity:

> [U]nless there is a 'specific legislative declaration' of a public interest, the public interest requirement . . . is not per se satisfied . . .

Examples of statutes which include a specific declaration of public interest include RCW 46.70.005 ("The legislature . . . declares that the distribution and sale of vehicles . . . vitally affects . . . the public interest . . ."). *See also* RCW 46.80.005 (public interest in sales of motor vehicle parts); RCW 48.01.030 (public interest in the business of insurance).

Two of our prior decisions suggest that either the Legislature *or the judiciary* may declare a public interest impact. *See Salois v. Mutual of Omaha Ins. Co., supra,* and *Sato v. Century 21 Ocean Shores Real Estate, supra.* To the extent those cases conflict with the rule that a legislative declaration of public interest is required to satisfy the public interest element per se, those two opinions are modified.

It is to be emphasized that when a statute containing a

legislative public interest pronouncement can be shown to have been violated, only the public interest requirement is satisfied per se. The other four elements of a private CPA action must be separately established.

In discussing per se public interest impact, we are aware of a great deal of confusion in terminology. "Per se", as used in the consumer protection context, has appeared in connection with entirely different concepts. *See* 61 Wash. L. Rev. 275 (1986). Indeed, there have been three different per se uses. First, there has been and continues to be a per se public interest impact, as outlined above, which establishes only the element of public interest. Second, as discussed earlier in this opinion, there is a legislatively declared per se unfair trade practice which establishes only the first two elements of a CPA action. Finally, the term "per se violation" has been broadly used to refer to actions in which either the public interest element or the "unfair or deceptive act" and "in trade or commerce" elements are met per se. The term "per se violation" is thus imprecise. It should be replaced by "per se public interest" or "per se unfair trade practice", depending upon which element or elements are satisfied per se.

The fourth element of a private CPA action requires a showing that plaintiff was injured in his or her "business or property". RCW 19.86.090. This has not previously been a separate element. However, the *Anhold* decision, by requiring a showing of "damage" as one prong of its public interest test, recognized a plaintiff's obligation to establish that he or she has suffered harm. Moreover, opinions of this court subsequent to *Anhold* have focused on the need for a specific showing of injury. *See Cooper's Mobile Homes, Inc. v. Simmons*, 94 Wn.2d 321, 327, 617 P.2d 415 (1980) (CPA plaintiffs must show that injury resulted from defendant's acts); *Seattle Rendering Works, Inc. v. Darling–Delaware Co.*, 104 Wn.2d 15, 701 P.2d 502 (1985) (unless plaintiffs are injured, they cannot prevail under the CPA). The injury involved need not be great, but it must be established.

The fifth element is that of causation. Only a person

"injured in his business or property *by* a violation of RCW 19.86.020 . . ." may bring a private action. (Italics ours.) RCW 19.86.090. A causal link is required between the unfair or deceptive acts and the injury suffered by plaintiff. This causation element, like the injury element, has been foreshadowed by our previous opinions. The *Anhold* "inducement" prong hints at a causation requirement. Moreover, the need to find a causal link between the alleged acts and the plaintiff's injury has been the focus of a number of prior decisions of both this court and the Court of Appeals. *See, e.g., Lidstrand v. Silvercrest Indus., supra; Transamerica Title Ins. Co. v. Johnson,* 103 Wn.2d 409, 693 P.2d 697 (1985); *Smith v. Olympic Bank,* 103 Wn.2d 418, 693 P.2d 92 (1985); *Nuttall v. Dowell,* 31 Wn. App. 98, 639 P.2d 832 (1982). *See also St. Paul Fire & Marine Ins. Co. v. Updegrave,* 33 Wn. App. 653, 656 P.2d 1130 (1983) (Roe, C.J., concurring in part, dissenting in part).

## III

Having redefined the elements of a private CPA action, we now apply those elements to the facts of the instant case. Here, the acts complained of were the deed preparation and closing activities of an escrow agent who did not alert the plaintiffs to the potential tax consequences of the transaction.

In this instance, the first element is not met. The trial court, on remand, concluded that Safeco's actions were not unfair or deceptive. There is substantial evidence in the record to support this conclusion.

Since private CPA plaintiffs must establish all five elements, the finding that the first element is not met is fatal to plaintiffs' claim. No other elements need be discussed. However, for illustrative purposes, we proceed through the analysis.

The second element is met. Safeco and the McNeils were involved in a loan closing, which is a commercial transaction. As such, the transaction occurred in "trade or com-

merce".

The public interest element is not met. The context in which these acts occurred was that of an essentially private transaction (escrow closing agent–client), rather than a consumer transaction. The factors to be used in the former include (1) whether defendant was acting in the course of his or her business, (2) whether defendant advertised to the general public, (3) whether defendant actively solicited this plaintiff, and (4) whether the parties were unequal bargainers. Here, Safeco, acting through its closing agent, was undeniably acting within the scope of its business. However, there are no facts in the record to indicate widespread advertising of loan closings. In fact, defendant was chosen by the lender. Plaintiffs merely followed the directions of their lender. Nor do facts show the McNeils were solicited to transact business with the Safeco agent as an attorney. In fact, the agent specifically told the McNeils she was not an attorney. Moreover, a third party, the FHLA loan officer, had earlier suggested to the McNeils that they might want to seek legal advice regarding the forthcoming transaction. Finally, the McNeils had a history of business experience. They were sole shareholders in a closely held corporation, and they retained an attorney and an accountant on a regular basis. Plaintiffs in this case are not representative of bargainers subject to exploitation and unable to protect themselves.

The fourth element, that of injury, was not established. Plaintiffs contended they were injured by a tax liability, yet they offered no verification that the liability existed or that they ever actually paid it. The trial court so concluded.

Finally, the causation element is missing. The trial court found as a fact that the plaintiffs' damages, if any, were not proximately caused by defendant's acts. Even assuming the injury complained of had been established, there is no plausible link between the actions of the closing agent and the alleged tax liability owed by the plaintiffs. As such, this

case is distinguishable from *Bowers v. Transamerica Title Ins. Co.,* 100 Wn.2d 581, 675 P.2d 193 (1983).

The *Bowers* court addressed the question of causation in a negligence context and held an escrow agent liable for failure to advise clients to seek independent counsel regarding sellers' acceptance of buyer's promissory note without a security interest. The link between the agent's actions and plaintiff's loss in that case was as follows: (1) the agent breached the ethical duty to disclose the advisability of independent counsel; (2) had plaintiffs been so advised, they would have obtained counsel; (3) any competent counsel would have advised against the unsecured sale of real estate; (4) armed with such advice, plaintiffs would not have conveyed without a security interest and the $30,000 loss plaintiffs incurred when their buyer defaulted would have been prevented. *Bowers,* at 590.

The same analysis as applied to the instant case presupposes that: (1) if the closing agent had been an attorney, she would have advised the McNeils to seek tax advice regarding the tax consequences of the transfer; (2) the McNeils would have sought such advice; (3) any attorney who was consulted could have provided advice which would have avoided the tax liability; (4) the McNeils would have taken the attorney's tax advice, restructured the transaction, and thus escaped the tax consequences. We, as did the trial court, find the foregoing analysis too tenuous. In particular, there is substantial evidence to support the conclusion that the tax liability in no way could have been avoided since the taxable event was a legal requirement of the lender. If it could not have been avoided, it could not have been caused by the acts of the closing agent.

A successful private plaintiff is entitled to attorney fees under RCW 19.86.090. A successful plaintiff is one who establishes all five elements of a private CPA action. Because these plaintiffs have not established all five elements, they cannot recover attorney fees. Accordingly, the

judgment against Safeco for attorney fees is reversed.

DOLLIVER, C.J., and UTTER, DORE, PEARSON, ANDERSEN, CALLOW, GOODLOE, and DURHAM, JJ., concur.