NOT FOR PUBLICATION

FILED

UNITED STATES COURT OF APPEALS

AUG 7 2025

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

CHARLES BOYD OLSON; JANINE
OLSON,

            Plaintiffs-Appellants,

    v.

UNISON AGREEMENT CORPORATION,

            Defendant-Appellee,

No. 23-2835

D.C. No. 2:22-cv-01859-RAJ

MEMORANDUM*

Appeal from the United States District Court
for the Western District of Washington
Richard A. Jones, District Judge, Presiding

Argued and Submitted October 23, 2024
San Francisco, California

Before:  S.R. THOMAS, WARDLAW, and COLLINS, Circuit Judges.

    In this putative class action, Plaintiffs Charles Boyd Olson and Janine Olson

appeal the district court's dismissal, for failure to state a claim, of their complaint

alleging violations of Washington's Consumer Protection Act ("WCPA").  We

have jurisdiction under 28 U.S.C. § 1291, and reviewing the dismissal *de novo*, *see*

*Zimmerman v. City of Oakland*, 255 F.3d 734, 737 (9th Cir. 2001), we reverse.

**I**

    The Olsons have resided in their home in Kent, Washington, since their

---

* This disposition is not appropriate for publication and is not precedent except as
provided by Ninth Circuit Rule 36-3.

marriage in 1990.  In early 2019, at a time when they were experiencing financial difficulties, the Olsons received a flyer in the mail from Unison that offered a way to obtain needed cash.  The flyer stated, in relevant part (footnotes and emphasis omitted):

> Great news!  You're pre-approved to access the equity locked in your home.
>
> With Unison, you can receive $79,850 and use that money for any purpose you choose—with no monthly payments and no interest.  Yes, you read that correctly.  It's almost too good to be true.
>
> This offer is possible because Unison invests in your home—with you.  We pay you a percent of your home's current value.  You make no payments to us until you sell.  If the value of your home increases from its current value, when you sell, Unison will share in a portion of the increase and make a profit.  If the value decreases, we incur a loss.  It's that simple.
>
> It's quick and easy.  Unison can provide the funds you need without the burden of additional debt.  Contact us today!

In three side boxes, the flyer also stated: (1) "NO INTEREST CHARGES  Unlike a home equity loan or home equity lines of credit, you'll pay no interest with Unison."; (2) "NO MONTHLY PAYMENTS  Use the money now, for up to 30 years, and pay nothing until you decide to sell."; and (3) "NO ADDED DEBT  By partnering with Unison you do not take on any additional debt."

After inquiring about the offer, the Olsons signed a "HomeOwner Agreement" with Unison, as well as other related documents, on March 26, 2019.  Under the terms of the agreement, Unison provided an advance of funds in the

2

amount of $64,750 in exchange for "an option to purchase," in the future, an undivided "70.00% ownership" of the Olsons' home (which was then valued at $370,000) for another payment of $194,250.[1]  The Olsons were also required to pay $2,525 in fees to complete the transaction and obtain the funds.  Unison's rights under the contract, and the Olsons' obligations, are secured by a deed of trust recorded on the property.

Unison's option can be exercised upon the following triggering events: (1) the expiration date of the contract in 30 years, (2) the sale of the property, (3) the death of the last surviving owner, or (4) "following a material and uncured event of Owner default."  If the triggering event is expiration of the contract or death of the owners, then upon exercise of the option and recording of Union's 70% interest as a co-owner, the property is to be promptly sold in order to pay Unison the value of its 70% interest in the property and any other amounts due to it.  If the triggering event is an uncured default, then Unison can either conduct a nonjudicial foreclosure sale or, with the Olsons' agreement, elect to conduct an "orderly market sale."  The agreement thus contemplates that, upon exercise of the

---

[1] That payment would be reduced, however, if the Olsons had "Unpaid Owner Obligations," which might occur if Unison was required, by default of the Olsons, to expend money to maintain the condition of the home or to procure appropriate insurance.  Such expenditures were referred to, in the relevant agreement papers, as "Protective Advances."  The complaint contains no allegations that Unison ever incurred any Protective Advances with respect to the Olsons' home.

option, the property in all events would be promptly sold and Unison would be paid what was owed to it. In the event of a sale, all expenses and closing costs would be paid entirely from any sales proceeds owed to the Olsons and not those owed to Unison.

Because exercising the option would give Unison a percentage interest in the property and not a fixed sum, the actual amount due to Unison after an exercise of the option and a sale could vary. A table provided to the Olsons showed some of the possible scenarios. For example, if the appraised value at the time the option was exercised was $518,000, a 70% equity interest would equal $362,600, and by purchasing that equity interest for $194,250, Unison would earn $168,350 in net proceeds, which would amount to a $103,600 gain on its initial payment of $64,750. But if the home was still worth only $370,000, a 70% equity interest would be $259,000, and Unison's payment of $194,250 would net $64,750, which would mean a $0 return on its then-recouped initial payment. But because the decision to exercise the option would rationally depend on the *marginal* value of exercising it, Unison would be expected to do so unless and until the value of its 70% share dropped below the marginal option exercise price of $194,250. That could occur only if the value of the house dropped by more than 25%, *i.e.*, to less than $277,500; at that point, a 70% interest would be worth $277,500 x 70%, which equals $194,250.

The agreement stated that Unison's product "is not designed for use as short-term financing," and it therefore provided that if the Olsons decided to sell the house within three years and the house value has declined, the Olsons would have to pay Unison back its initial $64,750 payment and any unpaid owner obligations. After the third anniversary of the HomeOwner Agreement, the Olsons can terminate the contract, without a sale, only by paying a "Special Termination Price" that would be the *greater* of (1) the sum of Unison's initial $64,750 payment and any additional owner obligations that had accrued; or (2) the amount that Unison would obtain if the house were to be sold at that time. Thus, unless and until a triggering event occurred, the Olsons could get out of the agreement only by paying back the full $64,750 plus Unison's share of any increase in the home's value. In other words, so long as the Olsons wished to stay in their home, they could only cancel the agreement by paying Unison back the full $64,750 they had received (plus, possibly, more).

In 2021, the Olsons thought about selling their home, but they realized that, in light of the HomeOwner Agreement and their pre-existing conventional mortgage, "they would receive almost nothing from the sale" of the property. In December 2022, the Olsons brought a class action complaint in state court against Unison, alleging that "Unison's HomeOwner Agreement product meets nearly all of the criteria for a reverse mortgage loan and functions as a reverse mortgage,"

5

and is therefore "subject to Washington law regulating such loans." The complaint asserted that, by failing to comply with such laws, and by engaging in unfair and fraudulent practices, Unison had violated the WCPA. The district court granted Unison's motion to dismiss, holding that Unison's HomeOwner Agreement was not a "loan" and that all of the Olsons' WCPA claims failed. Plaintiffs timely appealed.

## II

We separately address the three causes of action asserted by the Olsons under the WCPA.

## A

In their first WCPA cause of action, the Olsons allege a predicate violation of the Washington Consumer Loan Act ("WCLA"), which, under Revised Code of Washington § 31.04.208, is a "per se unfair trade practice" that is actionable under the WCPA if the practice caused injury to the plaintiffs in their business or property. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533, 535–39 (Wash. 1986). Specifically, the Olsons allege that their transaction with Unison involves a "reverse mortgage loan" under RCW §§ 31.04.501–31.04.540, which is a portion of the WCLA that is known as "the Washington state reverse mortgage act" ("WRMA"), *id*. § 31.04.500. The Olsons allege that the HomeOwner Agreement violates the WRMA because (1) Unison

6

lacks the necessary state approval to provide such loans, *id*. § 31.04.525; (2) the loan requires the Olsons to maintain insurance as specified by Unison, *id*. § 31.04.515(7), (8)(b); and (3) the loan was issued without following the WRMA's counseling requirement, *id*. § 31.04.515(9)–(10).  The Olsons further allege that, even if the transaction did not involve a "reverse mortgage loan" within the meaning of the WRMA, it still constituted a "loan" within the meaning of the WCLA, and that loan violated the WCLA because Unison lacks the requisite license to issue it.  *See id*. § 31.04.035(1).

In addressing these contentions, we begin with the WRMA's definition of the crucial term "reverse mortgage loan."  The WRMA provides:

> (5) "Reverse mortgage loan" means a nonrecourse consumer credit obligation in which:
>
>> (a) A mortgage, deed of trust, or equivalent consensual security interest securing one or more advances is created in the borrower's dwelling;
>>
>> (b) Any principal, interest, or shared appreciation or equity is due and payable, other than in the case of default, only after:
>>
>>> (i) The consumer dies;
>>>
>>> (ii) The dwelling is transferred; or
>>>
>>> (iii) The consumer ceases to occupy the dwelling as a dwelling; and
>>
>> (c) The broker or lender is licensed under Washington state law or exempt from licensing under federal law.

RCW § 31.04.505 (indentation added).  Unison contends that its arrangement with

7

the Olsons does not involve a "consumer *credit* obligation" and therefore falls outside the statutory definition. That is true, according to Unison, because "the homeowner does not borrow any money and is not obligated to pay any money or interest back." In particular, Unison argues that there is no guarantee that the initial $64,750 payment received by Plaintiffs need ever be returned.

The WCLA does not define the term "credit." "[I]n the absence of a statutory definition, [Washington courts] give the term its plain and ordinary meaning ascertained from a standard dictionary." *American Cont'l Ins. Co. v. Steen*, 91 P.3d 864, 867 (Wash. 2004). As relevant here, the term "credit" broadly refers to "[a]n arrangement for deferred payment of a loan or purchase." *Credit*, AMERICAN HERITAGE DICTIONARY 428 (5th ed. 2018); *see also Credit*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 532 (1981 ed.) ("an amount or limit to the extent of which a person may receive goods or money for payment in the future"). Accordingly, in order for a given arrangement to count as a "credit obligation," it must involve, at a minimum, an initial advance of funds or goods coupled with an obligation to make future payment to the person providing that advance. *Cf*. RCW § 31.04.015(14) (broadly defining a "loan," for purposes of the WCLA, as "a sum of money lent at interest or for a fee or other charge"). That understanding of "credit obligation" coheres with the remainder of § 31.04.505(5), which proceeds to address (1) the type of "advances" that are covered (*i.e.*, ones

8

secured by a security interest in the consumer's home); and (2) the types of future payments that are covered (*i.e.*, "[a]ny principal, interest, or shared appreciation or equity [that] is due and payable" after certain future events). *See* RCW § 31.04.505(5)(a), (b).

Here, Unison supplied an advance of funds—it gave the Olsons, up front, $64,750 (less certain fees). Unison contends, however, that, because its agreement with the Olsons only grants it an option, the additional essential ingredient of an *obligation* to make future payments back to Unison is missing. Whatever force this argument might have in other contexts, we conclude that it is unavailing here.

In construing the range of "consumer credit obligation[s]" covered by the statute, we cannot ignore what the statute itself says about the type of arrangements it covers. One example of a "credit obligation" the statute expressly covers is a secured obligation to pay over "shared appreciation or equity," RCW § 31.04.505(5)(b), and the statute further specifies that this obligation must be "nonrecourse," *id*. § 31.04.505(5), *i.e.*, that the obligation can only be enforced to the extent of the security interest granted in the deed of trust, *Milkovich v. United States*, 28 F.4th 1, 4 (9th Cir. 2022). But where the home secured by the deed of trust falls significantly in value, a nonrecourse obligation to pay over "shared appreciation" will not result in any payment to the beneficiary of the deed of trust. The statute thus expressly contemplates that a "consumer credit obligation" may

9

exist even though the actual future obligation to pay back sums may be entirely contingent upon future events, including sufficient "shared appreciation or equity."

Here, the future contingency is *Unison's election* to exercise its option, rather than merely an appreciation or decrease in the value of the home. We agree that, as a general matter, a consumer's grant of a purchase option in exchange for cash would not ordinarily be thought of as creating a "credit obligation," because it does not involve an advance of money in exchange for an expectation of future payments by the consumer back to the option holder. But given the details of the particular structure of *this* overall arrangement, which includes a formal option as one component but effectively creates the substance of a shared-appreciation reverse mortgage, we conclude that Unison's agreement with the Olsons sufficiently gave rise to a "credit obligation" to fall within the statute.

As we have explained, Unison's agreement with the Olsons is structured such that, unless the home falls in value by a substantial amount, the option will have marginal value and would be expected to be exercised when Unison is eligible to do so. At that point, the agreement contemplates that the house will promptly be sold, so that Unison will receive the cash payment then due (rather than retain the house as a co-owner). Unison will thereby recoup some or all of its initial payment to the Olsons—and potentially much more—depending upon how much the value of the home at the time of sale exceeds 75% or so of its original

10

value. Moreover, in the absence of a sale, the only way that the Olsons can remove the deed of trust on their home is by paying back the full amount of the initial payment ($64,750), plus any additional share of equity that may be due to Unison if the house has appreciated in value. The entire structure of the arrangement is designed to put Unison in the same position, and to have the same right to payment, as an unadorned nonrecourse obligation to pay Unison 70% of the home's equity, less $194,250. The fact that Unison must elect to receive that payment, by exercising the option, does not detract from the fact that, even prior to the exercise of the option, the Olsons have a very real set of contingent obligations to make future payments to Unison. Economically speaking, the only operative contingency is whether the value of the home's equity will decline, and, as we have noted, the statute clearly covers obligations to pay over future equity that are contingently recoverable only if the property does not depreciate in value.

Unison also argues that, even if its arrangement with the Olsons entails a "consumer credit obligation," it does not meet the statute's additional requirement that "one or more advances" be secured by a "mortgage, deed of trust, or equivalent consensual security interest" in the consumer's home. RCW § 31.04.505(5)(a). That is wrong. Unison relies on the fact that the deed of trust recites that the Olsons are not obligated to pay back the "Unison Investment Payment" (referring to the initial $64,750 payment) and that the deed of trust

11

consequently does not secure any such obligation.  But the same clause of the deed of trust goes on to say that "[t]he foregoing shall <u>not</u>, however, in any way limit any payment calculated and agreed by [the Olsons] to be paid" under the agreement, including both the earlier-described 70%-of-equity payment and the "Special Termination" payment.  The deed thus *does* secure all of the payments that Unison expects in the future in order to recoup the value of its $64,750 advance, including a potential payment (the "Special Termination Price") that specifically cannot be less than the $64,750 initial payment.  *See supra* at 5.  The Olsons' deed of trust thus does secure the "advance[]" within the meaning of the statute.[2]

Unison contends that, because the wording of the definition of "reverse mortgage loan" in § 31.04.505(5) closely matches the definition of "reverse mortgage transaction" in Regulation Z (issued by the Consumer Financial Protection Bureau ("CFPB") under the Federal Truth in Lending Act ("TILA")), *see* 12 C.F.R. § 1026.33(a), the Washington statute should be construed to follow the CFPB's "official interpretation" of that regulation, which states that it does not apply to "option contracts."  *See* 12 C.F.R. Part 1026, Supp. I, cmt. for § 1026.2(a)(14), cmt. 1.vii (stating that an "option contract[]" is not "considered

---

[2] Unison has not contended that the further elements in § 31.04.505(5)(b) and (c) are not met here.

12

credit for purposes of the regulation"). As noted earlier, we agree that option contracts generally do not constitute credit obligations, but that does not mean that the mere embedding of a formal option in a highly complex overall arrangement automatically exempts that arrangement from being classified as a "credit obligation." Moreover, the Washington law does not include any provision stating that § 31.04.505 should be interpreted consistently with the TILA, much less with the interpretations of that statute given by the CFPB. In enacting the WCLA, the Washington Legislature expressly cross-referenced, as applicable to that statute, several different definitions in the TILA, *see*, *e.g.*, RCW §§ 31.04.015(24),[3] 31.04.025(4)(g), but it did not do so here. *See State v. Delgado*, 63 P.3d 792, 795 (Wash. 2003) (stating that the exclusion, in one statute, of language that was included in a related statute should generally be presumed to be intentional).

For these reasons, we conclude that Unison's arrangement constitutes a "reverse mortgage loan" within the meaning of § 31.04.505(5). And for

---

[3] This section defines "residential mortgage loan" to mean "any loan primarily for personal, family, or household use that is secured by a mortgage, deed of trust, or other consensual security interest on a dwelling, *as defined in the truth in lending act*, or residential real estate upon which is constructed or intended to be constructed a dwelling." RCW § 31.04.015(24) (emphasis added). Contrary to what Unison contends in its brief, the referent of the phrase "as defined in the truth and lending act" is clearly "dwelling." *See* ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS §§ 18, 20 (2012) (describing the related canons applying a modifier only to the nearest reasonable referent or the last antecedent).

13

substantially the same reasons, it is also a "residential mortgage loan" under § 31.04.015(24) and a "loan" under § 31.04.015(14). We therefore reverse the dismissal of the Olsons' first cause of action.[4]

**B**

In their second cause of action, the Olsons alternatively allege that, even if their transaction with Unison did *not* involve a "reverse mortgage loan" within the meaning of the WCLA, it still involved an "unfair" practice in violation of the WCPA because Unison "purposely attempt[ed] to avoid reverse mortgage lending laws." Because we have concluded that the Olsons' arrangement *did* involve a "reverse mortgage loan" and that the Olsons have therefore stated a claim for a per se "unfair" trade practice under the WCPA, this alternative theory for stating an unfair practice is moot. That is, we do not understand the Olsons to be contending that, even if their agreement with Unison involves a reverse mortgage loan, they may maintain an additional, essentially duplicative WCPA "unfair" practices claim rooted in the same reverse mortgage lending laws. On that basis, we affirm the dismissal of this claim, but without prejudice.

---

[4] We agree with Unison that, because the result in this case turns on "Appellants['] conten[tion] that the particular characteristics of Unison's contracts render them 'reverse mortgage loans' under Washington law," certification of this issue to the Washington Supreme Court is unwarranted.

14

## C

In their third cause of action, the Olsons allege that certain statements made by Unison in connection with its marketing of the agreement were "deceptive" in violation of the WCPA. Unlike the Olsons' second cause of action, this one is based on different underlying conduct and a distinct theory of liability. Specifically, the Olsons allege that it was deceptive for Unison to market this arrangement as involving no "debt," "no monthly payments and no interest," and no "loan."

"[A] claim under the Washington CPA may be predicated upon . . . an act or practice that has the capacity to deceive substantial portions of the public." *Klem v. Washington Mut. Bank*, 295 P.3d 1179, 1187 (Wash. 2013). "A plaintiff need not show the act in question was intended to deceive, only that it had the capacity to deceive a substantial portion of the public." *Panag v. Farmers Ins. Co. of Wash.*, 204 P.3d 885, 894 (Wash. 2009). "Deception exists 'if there is a representation, omission or practice that is likely to mislead' a reasonable consumer." *Id*. at 895 (quoting *Southwest Sunsites, Inc. v. F.T.C.*, 785 F.2d 1431, 1435 (9th Cir. 1986)). In view of our earlier discussion, the Olsons have adequately alleged that the assertions that the transaction did not involve a "loan" or "debt" have the capacity to deceive. Moreover, because the WRMA expressly includes an "interest" payment "that is contingent on the value of the property

upon execution of the loan or at maturity, or on changes in value between closing and maturity," within its concept of "interest" in the context of a reverse mortgage, RCW § 31.04.515(2), we conclude that the Olsons have adequately alleged that the statement that "no interest" was involved is deceptive. By contrast, the Olsons' complaint pleaded no facts to support the assertion that it is deceptive to say that the arrangement involved "no monthly payments." Finally, although the Olsons attempt to raise additional alleged deceptive statements in their appellate briefing, these allegations were not in the complaint, and we decline to consider them for the first time on appeal.

* * *

For the foregoing reasons, we reverse the district court's dismissal of this action, and we remand for further proceedings consistent with this memorandum.

**REVERSED AND REMANDED.**