IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| NORTHWEST PRODUCT DESIGN GROUP, LLC, a Washington limited liability corporation; TODD D. ANDERSEN, an individual; MAC CAMERON, an individual; JERRY CHAMBERS, an individual; and ELLIS MASSEY, an individual, | ) ) ) ) ) ) ) ) | No. 67278-9-I |
| | ) | DIVISION ONE |
| Appellants/ Cross Respondents, | ) ) ) | UNPUBLISHED OPINION |
| v. | ) ) ) | |
| HOMAX PRODUCTS, INC., a Delaware corporation; RANDAL W. HANSON and JANE DOE HANSON, husband and wife, and the marital community thereof; ROSS CLAWSON and JANE DOE CLAWSON, husband and wife, and the marital community thereof; LESTER GREER, JR. and JANE DOE GREER, husband and wife, and the marital community thereof; and WILFRED HOFFMAN and JANE DOE HOFFMAN, husband and wife, and the marital community thereof, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Respondents/ Cross Appellants. | ) ) | FILED: March 11, 2013 |

SCHINDLER, J. — Northwest Product Design Group, LLC, (NPDG) filed a lawsuit

against Homax Products, Inc., alleging violations of the Washington Uniform Trade

Secrets Act, chapter 19.108 RCW, and the Washington Consumer Protection Act

(CPA), chapter 19.86 RCW, breach of contract, fraud and misrepresentation, tortious interference, unjust enrichment, and conversion. The trial court dismissed the CPA, tortious interference, and the fraud and misrepresentation claims under CR 12(b)(6). Following a two-week trial, the jury found Homax misappropriated trade secrets but that NPDG did not prove it was entitled to damages. The trial court dismissed the claims for conversion and unjust enrichment and entered a final judgment on the verdict. NPDG appeals the order dismissing the claims for violation of the CPA and fraud and misrepresentation, the order denying the motion to file an amended complaint to re-assert the CPA claim, and the court's decision to limit expert testimony on lost profit damages. NPDG also argues substantial evidence does not support the verdict, and the court abused its discretion by awarding Homax attorney fees under CR 11. We affirm in all respects.

## FACTS

Robert Cameron is an inventor and the president of Northwest Product Design Group, LLC (NPDG). Homax Products, Inc., is a Delaware corporation that operates in Bellingham, Washington. Homax develops, markets, and distributes products for the home improvement industry. Ross Clawson is the president and Randal W. Hanson is the chief financial officer of Homax.

In 1995, Cameron obtained a patent for a product he invented called the Sure-Lock Crocodile Clip (Crocodile Clip). The Crocodile Clip is a three-inch device used to secure a tarp. The Crocodile Clip has "jaw portions" on one end that grip the tarp sheet fabric. On the other end is a slot, hole, or hook.[1] The three-inch Crocodile Clip has a

---

[1] Attaching the clip to the tarp creates a fixture onto which one can tie a rope, strap webbing, or hook a bungee cord.

slide that "closes the teeth and locks." To release, "[y]ou push the button on the top and slide it back." The Cameron Group Acquisition Corporation (Cameron Group), consisting of Cameron and other investors, owned the rights to the Crocodile Clip.

On March 17, 2000, the Cameron Group entered into an exclusive distribution and licensing agreement with Homax. Under the terms of the agreement, Homax owned the rights to the Crocodile Clip. Homax successfully marketed the Crocodile Clip and paid over $100,000 in royalties to the Cameron Group for the sales of the clip.

In the late 1990s, Cameron's nephew Todd Andersen, and Cameron's son Mac Cameron, together with Cameron, invented two other tarp clips: the Jaws Clip and the Rhino Clip. An engineer in Everett built the prototypes for the Rhino Clip. Dragon/Tex Industrial Company in Vancouver, British Columbia, worked with Andersen and Mac Cameron on manufacturing the Rhino Clip.

The Rhino Clip is larger than the Crocodile Clip. Unlike the Crocodile Clip, the Rhino Clip uses a threaded thumb screw instead of a sliding lock mechanism. The Rhino Clip closes with a thumb screw that "you can unscrew . . . , you can spread it open and take it all the way up to three-eighths to half-inch industrial tarp. But when you tighten it down it's positive, it's not going to come loose."

Andersen and Mac Cameron worked with a business in Mount Vernon, Parallel Precision, to build the prototypes for the Jaws Clip. Like the Rhino Clip, the Jaws Clip has a ring on the back so that "when you screw the ring on . . . it closes and clamps the jaws down."

Sometime in 1999 or 2000, Robert Cameron contacted Homax about marketing the Rhino Clip to Lowe's Home Improvement and other "big box" stores. Cameron

provided Clawson and Hanson with information, drawings, and prototypes of the Rhino Clip. Cameron said he also provided information about the Jaws Clip. According to Cameron, Hanson discouraged him from contacting other distributors "as such communications would harm the market for similar Homax products."

During the meetings with Clawson and Hanson in 2000, Cameron discussed executing a confidentiality and nondisclosure agreement. Cameron testified that the parties eventually agreed to the terms of a confidentiality agreement. Cameron and Hanson signed the confidentiality agreement but Clawson did not. However, Cameron said he had no concerns because he had previously worked with Clawson and Hanson.

In January 2001, Cameron sued the Cameron Group for breach of contract, breach of fiduciary duty, failure to pay wages, unjust enrichment, and tortious interference with business relationships.

Cameron and Charles Gravely formed NPDG. Cameron is the president of NPDG. NPDG owns the rights to the Rhino Clip. Cameron, Andersen, Mac Cameron, Ellis Massey, and Jerry Chambers formed the Jaws Partnership. The partnership owns the rights to the Jaws Clip. Clawson and Hanson told Cameron that Homax would not enter into any agreements with NPDG until after the litigation with the Cameron Group was resolved.

Cameron and Gravely were involved in litigation with the Cameron Group from 2001 until 2003. From 2000 through 2003, Cameron marketed the Rhino Clip at small stores and trade shows, sent dozens of Rhino Clips to potential buyers, and sold thousands of the Rhino Clips through a Canadian distributor. On May 30, 2001, Cameron filed a patent application for the Rhino Clip.

4

Homax began working on a modification of the Crocodile Clip in 2002 and developed the Cinch Tite Clip. The Cinch Tite Clip uses a sliding mechanism like the Crocodile Clip. The Cinch Tite Clip does not have a screw-down mechanism like the Rhino Clip and the Jaws Clip.

After the litigation with the Cameron Group was resolved in August 2003, Cameron contacted Homax. Hanson told Cameron that because another company was in the process of acquiring the company, Homax could not enter into an agreement until the acquisition was complete.

On March 2, 2004, Homax obtained a patent on the Cinch Tite Clip. Homax never entered into a distribution or licensing agreement with Cameron for the Rhino Clip or the Jaws Clip.[2]

On January 8, 2007, NPDG and the Jaws Partnership (collectively NPDG) filed a complaint against Homax.[3] NPDG claimed that the patent Homax obtained for the Cinch Tite Clip contained protected information about the Rhino Clip and the Jaws Clip. NPDG alleged Homax misappropriated trade secrets to obtain design and manufacturing information for its own use and benefit, and to prevent NPDG from marketing the competing tarp clips. The complaint asserts claims for (1) violation of the CPA, (2) violation of the Uniform Trade Secrets Act, (3) fraud and misrepresentation, (4) breach of contract, (5) unjust enrichment, (6) tortious interference with prospective economic advantage, (7) common law conversion, and (8) unfair business practices.

Homax filed a motion to dismiss under CR 12(b)(6) for failure to state a claim upon which relief can be granted. The trial court dismissed the claims for violation of

---

[2] NPDG obtained the patent for the Rhino Clip on December 17, 2008.

[3] NPDG filed an amended complaint on February 9, 2007. NPDG amended the complaint to include an exhibit. The amended complaint otherwise does not differ from the original complaint.

the CPA, fraud and negligent misrepresentation, tortious interference, and unfair business practices. The court denied the motion to dismiss the claims for violation of the trade secret act, breach of contract, unjust enrichment, and conversion.

In July 2008, NPDG filed a motion to file a second amended complaint to re-assert a CPA claim on the grounds of newly discovered information. The court denied the motion to file a second amended complaint. On February 26, 2009, the court denied NPDG's motion to file a third amended complaint to allege an attempt to monopolize in violation of RCW 19.86.040.

In February 2009, Homax notified NPDG that if NPDG continued to pursue the claim for violation of the trade secrets act, it would request an award of attorney fees. Homax cited the deposition testimony of Cameron that described "sending clips to dozens of third parties" as early as 2001, as well as his admission that the patent "published in 2002 disclosed to the public the Rhino Clip."

On April 9, 2009, Homax filed a motion for summary judgment dismissal of the claims for violation of the trade secrets act, breach of contract, unjust enrichment, and conversion. Homax argued the undisputed facts established that NPDG did not have a claim for violation of the trade secrets act for the Rhino Clip. Homax pointed to Cameron's admission that he widely distributed samples of the Rhino Clip to third parties since January 2000, and filed the Rhino Clip patent application in May 2001. Homax also argued that although there was no dispute the parties discussed entering into an agreement to distribute and license the Rhino Clip, Hanson did not recall any discussion about the Jaws Clip. Homax further asserted that the parties did not enter into a binding confidentiality agreement.

6

In response to the motion for summary judgment, Cameron conceded NPDG did not have a claim for violation of the trade secrets act with respect to the Rhino Clip. "Upon careful review of Defendants' argument, Plaintiffs will not pursue a cause of action under the [trade secrets act] with respect to the Rhino Clip for purposes of summary judgment."

The court entered an order granting in part and denying in part the motion for summary judgment. The court dismissed the Rhino Clip trade secret and conversion claims, but denied summary judgment as to "all causes of action regarding the 'Jaws' Clip."

The two-week jury trial began on February 9, 2011, on the claim that Homax violated the trade secret act as to the Jaws Clip, breach of contract as to the Rhino Clip, and unjust enrichment as to the Rhino Clip and the Jaws Clip. At the conclusion of NPDG's case in chief, the court granted the motion for a directed verdict on the breach of contract claim. The court also ruled that following jury deliberations, it would rule on the equitable claims of conversion and unjust enrichment.

NPDG did not object to the jury instructions or the special verdict form. The court instructed the jury that NPDG did not have any trade secrets to the Crocodile Clip and that NPDG had no ownership rights in the Crocodile Clip. Jury Instruction No. 14 states:

> There are no trade secrets concerning the Crocodile Clip, and the Plaintiffs have no ownership rights in any aspect of the Crocodile Clip.
> The public, including Defendant, is free to use publicly available information regarding the Crocodile Clip that is readily ascertainable by proper means, including from examination of the Crocodile Clip itself.
> Evidence that Defendant knew of, or made use of the Crocodile Clip or publicly available information concerning the same is therefore not evidence that supports Plaintiffs' claims that Defendant misappropriated

the alleged Jaws Clip trade secrets and is therefore not to be considered as proof of the Plaintiffs' Jaws Clip trade secret claims against Defendant.

The court also instructed the jury that NPDG did not have any trade secrets to the Rhino Clip. "The public, including [Homax], is free to use publicly available information regarding the Rhino Clip that is readily ascertainable by proper means, including from examination of the Rhino Clip itself."[4]

In the special verdict form, the jury found that although Homax misappropriated trade secrets, NPDG did not prove that it was entitled to damages for "misappropriation of the Jaws Clip trade secret." Following the jury verdict, the court ruled NPDG was not entitled to damages on the equitable claims of conversion or unjust enrichment. The court entered findings of fact and conclusions of law.

Before entry of the final judgment, Homax filed a motion under CR 11 for an award of attorney fees for defending against the meritless claims NPDG asserted as to the Rhino Clip. The court awarded $4,500 to Homax.

## ANALYSIS

NPDG appeals (1) the order granting the CR 12(b)(6) motion to dismiss the claims for violation of the CPA and fraud and misrepresentation, (2) the order denying the motion to file a second amended complaint to re-assert a CPA claim, (3) the court's decision to limit Cameron's testimony on lost profit damages, (4) the jury verdict, (5)

---

[4] Jury Instruction No. 13 states:

There are no trade secrets concerning the Rhino Clip. The public, including the Defendant, is free to use publicly available information regarding the Rhino Clip that is readily ascertainable by proper means, including from examination of the Rhino Clip itself.

Evidence that Defendant knew of, or made use of the Rhino Clip or publicly available information concerning the same is therefore not evidence that supports Plaintiffs' claims that Defendant misappropriated the alleged Jaws Clip trade secrets and is therefore not to be considered as proof of the Plaintiffs' Jaws Clip trade secret claims against Defendant.

dismissal of the equitable claims for conversion and unjust enrichment, (6) the order granting attorney fees under CR 11, and (7) entry of judgment on the verdict. NPDG seeks reversal and remand for a new trial.[5]

## Motion to Dismiss

NPDG contends that the trial court erred in granting the CR 12(b)(6) motion to dismiss the claims for violation of the CPA and fraud and misrepresentation. The decision to dismiss claims under CR 12(b)(6) is a question of law that we review de novo. San Juan County v. No New Gas Tax, 160 Wn.2d 141, 164, 157 P.3d 831 (2007).

Dismissal for failure to state a claim upon which relief can be granted is appropriate only where it appears, beyond a reasonable doubt, that no set of facts, consistent with the complaint, would entitle the plaintiff to recovery. CR 12(b)(6); Tenore v. AT&T Wireless Servs., 136 Wn.2d 322, 329-30, 962 P.2d 104 (1998). We presume the allegations in the complaint are true. Tenore, 136 Wn.2d at 330. However, the court need not accept legal conclusions in the complaint as correct. Haberman v. Wash. Pub. Power Supply Sys., 109 Wn.2d 107, 120, 744 P.2d 1032, 750 P.2d 254 (1987). On a CR 12(b)(6) motion, the court must not consider testimony outside the pleadings. Brown v. MacPherson's, Inc., 86 Wn.2d 293, 297, 545 P.2d 13 (1975).[6]

### CPA Claim

The CPA prohibits "[u]nfair methods of competition and unfair or deceptive acts

---

[5] Homax filed a cross appeal. But Homax did not address the cross appeal in the brief. Accordingly, the cross appeal is abandoned. RAP 10.3(b) (on appeal, a party must state assignments of error).

[6] Accordingly, we disregard NPDG's brief citations to declarations and trial testimony.

or practices in the conduct of any trade or commerce." RCW 19.86.020. To establish a CPA violation, NPDG must prove that (1) Homax engaged in an unfair or deceptive act or practice, (2) in trade or commerce, (3) that impacts the public interest, (4) resulting in injury to business or property, and (5) a causal link between the unfair or deceptive practice and the injury suffered. Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 784-85, 719 P.2d 531 (1986). The failure to establish any of these elements is fatal to a CPA claim. Hangman Ridge, 105 Wn.2d at 793. Whether the allegations in the complaint give rise to a CPA claim is a question of law that we review de novo. Leingang v. Pierce County Med. Bureau, Inc., 131 Wn.2d 133, 150, 930 P.2d 288 (1997).

NPDG and Homax dispute whether the allegations in the complaint establish the public interest element.[7] The purpose of the CPA is to " 'protect the public.' " Michael v. Mosquera-Lacy, 165 Wn.2d 595, 604, 200 P.3d 695 (2009) (quoting RCW 19.86.920). The public interest element of a CPA claim requires a finding that the allegations show that Homax's unfair or deception act injured the public interest.[8] NPDG must show an impact to public interest separate and apart from showing an unfair and deceptive act. Holiday Resort Cmty. Assoc. v. Echo Lake Assocs., L.L.C., 134 Wn. App. 210, 226, 135 P.3d 499 (2006).

Where a dispute is essentially private, " 'it may be more difficult to show that the public has an interest in the subject matter.' " Hangman Ridge, 105 Wn.2d at 794; Mosquera-Lacy, 165 Wn.2d at 605 (quoting Hangman Ridge, 105 Wn.2d at 790).

---

[7] The parties do not dispute that the transaction was private, agreeing that the controlling factors are those that apply to "essentially . . . private dispute[s]." Hangman Ridge, 105 Wn.2d at 790.

[8] In 2009, the legislature enacted RCW 19.86.093 codifying the test for establishing injury to the public interest. LAWS OF 2009, ch. 371, § 2.

"Ordinarily, a breach of a private contract affecting no one but the parties to the contract is not an act or practice affecting the public interest." Hangman Ridge, 105 Wn.2d at 790.

" '[I]t is the likelihood that additional plaintiffs have been or will be injured in exactly the same fashion that changes a factual pattern from a private dispute to one that affects the public interest.' " Mosquera-Lacy, 165 Wn.2d at 604[9] (quoting Hangman Ridge, 105 Wn.2d at 790). To establish an act or practice affects the public interest, there must be a real and substantial potential for repetition, " 'as opposed to a hypothetical possibility of an isolated unfair or deceptive act's being repeated.' " Mosquera-Lacy, 165 Wn.2d at 604-05 (quoting Eastlake Constr. Co., Inc. v. Hess, 102 Wn.2d 30, 52, 686 P.2d 465 (1984)).

In determining whether an alleged deceptive act or practice affects the public interest, the court evaluates four factors: (1) whether the alleged acts were committed in the course of defendant's business; (2) whether the defendant advertised to the public in general; (3) whether the defendant actively solicited this particular plaintiff, indicating potential solicitation of others; and (4) whether the plaintiff and defendant have unequal bargaining positions. Hangman Ridge, 105 Wn.2d at 790-91. These factors are not exclusive, no one factor is dispositive, and it is not necessary that all be present. Hangman Ridge, 105 Wn.2d at 791.

NPDG argues the allegations in the complaint establish an alleged act or practice that affects the public interest. The complaint alleges that Homax "solicits ideas, trade secrets and patent rights from individuals and entities;" that its "business depends on solicitation of the public for ideas, trade secrets and patent rights;" that Homax

---

[9] (Alteration in original.)

11

advertises to the general public; and the parties "occupied unequal bargaining positions."

But the complaint does not allege a causal connection between these conclusory allegations and the alleged unfair and deceptive act or practice. To the contrary, the complaint alleges Cameron contacted Homax based on their prior successful agreement that allowed Homax to license and market the Crocodile Clip. The complaint also states that Cameron "had no concern about confidentiality and disclosure as he had previously worked with Homax, particularly with Hanson and Clawson."[10] The complaint asserts only that Homax solicited NPDG. Further, there are no allegations that the alleged "representations and assurances" of Clawson and Hanson that Homax was interested in "doing business" with NPDG in order to obtain trade secrets was part of "a pattern or generalized course of conduct" creating a "real and substantial potential for repetition of defendant's conduct." Eifler v. Shurgard Capital Mgmt. Corp., 71 Wn. App. 684, 697, 861 P.2d 1071 (1993).

The complaint also does not establish unequal bargaining power. As in Hangman Ridge, the allegations show NPDG had a "history of business experience" and were "not representative of bargainers subject to exploitation and unable to protect themselves." Hangman Ridge, 105 Wn.2d at 794.

The complaint alleges that NPDG owns the rights to the Rhino Clip, and worked with a Canadian company and an engineer in Everett to provide engineering drawings and build a prototype for the Rhino Clip. The Jaws Partnership owns the rights to the Jaws Clip and worked with a business in Mount Vernon to build prototypes. The

---

[10] Sign-O-Lite Signs, Inc. v. DeLaurenti Florists, Inc., 64 Wn. App. 553, 825 P.2d 714 (1992), is distinguishable. In Sign-O-Lite, the evidence established routine solicitation of other businesses. Sign-O-Lite, 64 Wn. App. at 563.

complaint also alleges NPDG employs a consultant, negotiated the terms of a confidentiality agreement with Homax, and Cameron was involved in lengthy litigation with the Cameron Group.

Even accepting the material allegations of the complaint as true, NPDG has not pleaded sufficient facts to establish the public interest element of a CPA violation. The trial court properly dismissed NPDG's CPA claim.

### Fraud and Misrepresentation Claim

In order to state a claim for fraud and misrepresentation, NPDG must prove (1) representation of an existing fact, (2) materiality, (3) falsity, (4) knowledge that the statement is false, (5) intent that it should be acted on by the person to whom it is made, (6) ignorance of its falsity, (7) reliance on the truth of the representation, (8) the right to rely on it, and (9) damage. Adams v. King County, 164 Wn.2d 640, 662, 192 P.3d 891 (2008). Insufficient proof on any one element is fatal. Beckendorf v. Beckendorf, 76 Wn.2d 457, 462, 457 P.2d 603 (1969). Under CR 9(b), "the circumstances constituting fraud or mistake shall be stated with particularity." Adams, 164 Wn.2d at 662.

In order to state a claim, NPDG must assert Homax misrepresented an "existing fact." Havens v. C&D Plastics, Inc., 124 Wn.2d 158, 182, 876 P.2d 435 (1994). "A promise of future performance is not a representation of an existing fact and will not support a fraud claim." West Coast, Inc. v. Snohomish County, 112 Wn. App. 200, 206, 48 P.3d 997 (2002).

> Where the fulfillment or satisfaction of the thing represented depends upon a promised performance of a future act, or upon the occurrence of a

future event, or upon particular future use, or future requirements of the representee, then the representation is not of an existing fact.

Nyquist v. Foster, 44 Wn.2d 465, 471, 268 P.2d 442 (1954). Consequently, statements of future performance or potentially occurring events are not typically actionable under a theory of fraud and misrepresentation.

NPDG relies on the exception in Markov v. ABC Transfer & Storage Co., 76 Wn.2d 388, 457 P.2d 535 (1969), to argue the complaint states a claim for fraud. In Markov, the court held that if a promise is made for the purpose of deception and with no intention of performing, it is actionable. Markov, 76 Wn.2d at 396. NPDG also relies on Beckendorf. In Beckendorf, the plaintiffs' son admitted promising he would allow his parents to live on the ranch and enjoy the profits if they conveyed the ranch to him, but did not intend to keep his promise. Beckendorf, 76 Wn.2d at 458, 463. The court held the parents failed to establish the "vital element" of reliance because the evidence showed they did not rely on their son's promise, and set aside the judgment for fraud. Beckendorf, 76 Wn.2d at 463-64.

In the complaint, NPDG alleges Homax wrongfully obtained information about the Rhino Clip and the Jaws Clip with the intent to deceive, and NPDG relied upon the misrepresentations. While NPDG alleges Homax assured NPDG it would execute a copy of the confidentiality agreement, other allegations in the complaint show NPDG did not rely on that assurance. None of the other allegations amount to an affirmative misrepresentation of an existing fact necessary to support a cause of action for fraud.

Motion to File Second Amended Complaint

NPDG contends the trial court erred in denying the motion to file a second amended complaint to re-assert a CPA claim.

14

CR 15(a) permits a party to amend a pleading by leave of court, and leave shall be freely given when justice so requires. The amendment of pleadings is left to the sound discretion of the trial court, whose determination will be overturned on review only for an abuse of that discretion. Herron v. Tribune Publ'g Co., Inc., 108 Wn.2d 162, 165, 736 P.2d 249 (1987). Discretion is abused if it is manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons. State ex rel. Carroll v. Junker, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). In deciding whether to grant a motion to amend, "the court may consider the probable merit or futility of the amendments requested." Doyle v. Planned Parenthood of Seattle-King County, Inc., 31 Wn. App. 126, 131, 639 P.2d 240 (1982).

The proposed second amended complaint alleged newly discovered evidence showing that from March 2000 until December 2005, Homax solicited the general public by advertising on web sites. Homax argued there was no connection between the web site advertising and the business relationship between the parties.

The trial court did not abuse its discretion in denying the motion to file the second amended complaint to re-assert the CPA claim. The undisputed evidence showed Cameron contacted Homax because of the previous successful distribution and licensing agreement for the Crocodile Clip, and not advertising on the web site.

Lost Profits

NPDG contends the trial court erred in limiting expert testimony on lost profits. Contrary to NPDG's characterization, the trial court ruling was much more limited.

NPDG identified Cameron as "an expert in clip marketing" and lost profit damages. NPDG stated that Cameron would testify that "over time, . . . the plaintiffs'

products would have gained market share from the defendants' products." NPDG

identified Michael R. Ruble as an "expert in damage calculation" who would testify about

"the quantitative damages suffered by the Plaintiffs as a result of being denied this

portion of the industry."[11] NPDG also designated two charts as exhibits that calculated

damages of $1.5 million "based on Rhino/Jaws clips entering the market and being sold

by large retailers during 2002."

Homax filed a motion in limine arguing that Cameron was not qualified to testify

as to lost profit damages for the Jaws Clip, and his testimony was speculative. Homax

also filed a motion to exclude Ruble from testifying on lost profits and to exclude the two

charts as based on speculative assumptions. Homax cited Cameron's deposition

testimony that NPDG never marketed or sold any Jaws Clips and never placed a

product at the "big box" stores.

NPDG asserted that Cameron was qualified to testify on the market share, and

would testify at trial that "within five years [NPDG] would have sales that would equal

---

[11] Ruble testified in his deposition that he did not have an opinion on market share and sales to large retailers.

> Q. Do you have an independent opinion as to whether plaintiffs are capable of capturing 50 percent of Homax's clip sales?
> [Plaintiffs' Counsel]: Objection, form.
> A. Not my area of expertise. And I wasn't asked to assess that. . . . My job at this point is to evaluate the calculations, not whether it's appropriate to the damage model.
> Q. . . . . Do you have an opinion as to how the damages analysis of page 2 of Exhibit 119 would change if it was established that plaintiffs lacked the capability to sell to large retailers?
> [Plaintiffs' Counsel]: Objection, form.
> A. I don't think I can answer that question, because I don't -- again, I'm here as an expert to verify how the spreadsheet was prepared, not dealing with the underlying assumption or changes to those assumption[s].

one-half of the existing sales of the Cinchtite [sic]."[12]

The court granted the motion to preclude Cameron from testifying as an expert on the market share for the Jaws Clip. The court ruled that Cameron's testimony about the market share for the Jaws Clip was speculative.

> I think it is a proximate cause concern, and beyond that I think it's pretty speculative. I don't know -- without anything at all we would be asking the fact finder to speculate as to what the profits would be if the plaintiff had decided to market the clip. And that's just, as the court sees it, just too speculative without any evidence at all of marketability or sales. I'm going to grant the motion.

The trial court ruled that Cameron "can testify as to the advantages and disadvantages and which clip is better and which one is more useful, all of those things because he is certainly qualified to do that." The court also ruled that subject to proper foundation and objections at trial, Cameron and Ruble could testify about damages and NPDG could use the two charts.

> Well, certainly if they're going to be, if they have a witness on the stand, I will rule on the evidentiary aspects of this, but if they have a chart that they want to come into court with, I can determine if something is going to the jury or not. I don't want to limit each side from what they want to put on a chart. Certainly they will have to have proper foundation for getting the testimony in. So I don't want to be messing with their chart preparation at this stage of the proceeding.
> . . . .
> . . . I'm going to allow the plaintiff to establish, attempt to establish the expertise of both of these gentlemen with regard to their expertise, and I think I need to manage this by just entertaining objections to the questions that are asked to determine whether or not the question falls within the area that the foundation has been laid as to their expertise. I'm

---

[12] NPDG asserted:

I'm also going to ask [Cameron] to testify about his views and opinions in regard to whether if his company were in the market whether it could displace or take over some of the Homax business, and he is going to testify yes because of these features the Rhino and even the Jaws when it comes on board would displace the Cinchtite [sic], that's the current clip, or the earlier Crocodile Clip, to the tune of about 20 percent a year up to five years when it would have half of the sales within the company.

not going to micromanage this. I'm going to handle this as an evidentiary issue during the course of the trial.

NPDG did not call Ruble to testify at trial. Cameron testified that NPDG sold the Rhino Clips in small stores in orders of "[a]nywhere from a box of fifty up to maybe a thousand." NPDG also presented evidence about sales of the Cinch Tite Clip, gross sales, and testimony about the number of Cinch Tite Clips sold by Homax. Cameron testified that in his opinion, the Jaws Clip was worth $450,000.

Absent an abuse of discretion, we do not disturb on appeal a trial court's rulings on motions in limine, the admissibility of evidence, and the admissibility and scope of expert testimony. Hume v. Am. Disposal Co., 124 Wn.2d 656, 666, 880 P.2d 988 (1994); Gammon v. Clark Equip. Co., 38 Wn. App. 274, 286, 686 P.2d 1102 (1984). A court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. Olver v. Fowler, 161 Wn.2d 655, 663, 168 P.3d 348 (2007).

> [T]he standard that the trial court must apply in deciding whether to exercise its discretion has three parts: (1) is the witness qualified to testify as an expert, (2) is the expert's theory based on a theory generally accepted in the scientific community, and (3) would the testimony be helpful to the fact finder?

Saldivar v. Momah, 145 Wn. App. 365, 397, 186 P.3d 1117 (2008).

Under the Uniform Trade Secrets Act, "a complainant may recover damages for the actual loss caused by misappropriation," together with any additional damages needed to compensate for unjust enrichment. RCW 19.108.030(1). Lost profits are a "recoverable element" of actual damages. Eagle Group, Inc. v. Pullen, 114 Wn. App. 409, 421, 58 P.3d 292 (2002). Damages must be supported by evidence that provides a reasonable basis for estimating the loss and does not amount to mere speculation or

conjecture. Shinn v. Thrust IV, Inc., 56 Wn. App. 827, 840, 786 P.2d 285 (1990). In other words, lost profit damages "must be susceptible of ascertainment in some manner other than by mere speculation, conjecture, or surmise and by reference to some definite standard, such as market value, established experience, or direct inference from known circumstances." Gaasland Co., Inc. v. Hyak Lumber & Millwork, Inc., 42 Wn.2d 705, 713, 257 P.2d 784 (1953).[13]

To recover lost profit damages, NPDG must prove lost profits with reasonable certainty. Larsen v. Walton Plywood Co., 65 Wn.2d 1, 16, 390 P.2d 677 (1964). Lost profits are recoverable as damages if contemplated by the parties at the time the contract was made, are the proximate result of defendant's breach, and are proven with reasonable certainty. Larsen, 65 Wn.2d at 15. Expert testimony may support lost profits if based on "tangible evidence." Larsen, 65 Wn.2d at 19.

> So long as [experts'] opinions afford a reasonable basis for inference, there is departure from the realm of uncertainty and speculation. Expert testimony alone is a sufficient basis for an award for loss of profits. . . . Although expert testimony is a sufficient basis for an award of lost profits, their opinions must be based upon tangible evidence rather than upon speculation and hypothetical situations.

Larsen, 65 Wn.2d at 17, 19.

NPDG relies on No Ka Oi Corp. v. Nat'l 60 Minute Tune, Inc., 71 Wn. App. 844, 863 P.2d 79 (1993), to argue the court erred in limiting evidence of lost profit damages for the Jaws Clip. In No Ka Oi, the expert testified about lost profits but did not base his opinion on an analysis of similar businesses in the vicinity, or "local comparables." We rejected the requirement that lost profit damages must always be based on "local comparables" and held that " '[w]here the fact is well established that profits would have

---

[13] (Emphasis omitted) (internal quotation marks omitted).

been made and the difficulty in proving their amount is directly caused by the defendant's breach, a greater liberality is permitted in making estimates and drawing inferences.' " No Ka Oi, 71 Wn. App. at 851 (quoting Larsen, 65 Wn.2d at 17). But here, unlike in No Ka Oi, the fact that profits would have been made for sales of the Jaws Clip is speculative. Cameron admitted he never marketed or sold any of the Jaws Clips and never filed a patent application for the Jaws Clip. The trial court did not abuse its discretion in ruling that Cameron's testimony on the market share for sales of the Jaws Clip and lost profit damages was speculative.

Jury Verdict

NPDG contends that after the jury found Homax misappropriated the Jaws Clip trade secret, as a matter of law, NPDG was entitled to an award of damages under the Uniform Trade Secrets Act. Neither the Uniform Trade Secrets Act nor the jury instructions in this case support NPDG's argument.

Under the Uniform Trade Secrets Act, a plaintiff "may recover damages for the actual loss caused by misappropriation," and "may recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss." RCW 19.108.030(1).[14]

NPDG did not object to the jury instructions or the special verdict form. Under the law of the case doctrine, if not objected to, the instructions given to the jury by the trial court shall be treated as the applicable law. State v. Hickman, 135 Wn.2d 97, 102, 954 P.2d 900 (1998). Here, the jury instructions did not require the jury to award damages upon finding Homax misappropriated the trade secret.

---

[14] (Emphases added.)

20

Jury Instruction No. 4 sets forth NPDG's burden of proof on misappropriation of trade secrets. Jury Instruction No. 4 states that in order to prove that Homax misappropriated trade secrets as to the Jaws Clip, NPDG had the burden of proving both that Homax misappropriated trade secrets, and that the misappropriation was the proximate cause of damages. Jury Instruction No. 4 states:

> On the claim of misappropriated trade secrets, [NPDG] has the burden of proving each of the following propositions:
> (1) That Plaintiffs [NPDG] had a trade secret in the Jaws clip;
> (2) That Defendant Homax Products misappropriated Plaintiffs's [sic] trade secrets; and
> (3) That the Defendant misappropriation was a proximate cause of damages to Plaintiffs; and
> (4) That, as a result of the misappropriation, Defendant received money or benefits that in justice and fairness belong to Plaintiffs.
> If you find from your consideration of all the evidence that each of these propositions has been proved, then your verdict should be for the Plaintiffs. On the other hand, if you find that any of these propositions has not been proved, your verdict should be for the Defendant.[15]

---

[15] Jury Instruction No. 7 defines "trade secret."

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process that:
    (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
    (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
Jury Instruction No. 8 defines "independent economic value."

Information has "independent economic value" if it gives the owner of the information a competitive advantage over others who do not know the information.
In determining whether information about the Jaws Clip derives "independent economic value" from not being generally known or readily ascertainable, you may consider, among other factors, the following:
    (1) The value of the information to the Plaintiffs and their competitors.
    (2) The amount of efforts or money that the plaintiff expended in developing the information.
    (3) The extent of measures that Plaintiffs took to guard the secrecy of the information.
    (4) The ease or difficulty of acquiring or duplicating the information by proper means, such as independent design or reverse engineering.
    (5) The degree to which third parties have placed the information in the public domain or rendered the information readily ascertainable.
    (6) The degree to which Plaintiffs have placed the information in the public domain or rendered the information readily ascertainable.

Jury Instruction No. 18 further states:

> A person who is liable for damages to another person's business is not liable for any damages arising after the original event that are proximately caused by failure of the injured person to exercise ordinary care to avoid or minimize such new or increased damages[.]
>
> Defendant has the burden to prove Plaintiffs' failure to exercise ordinary care and the amount of damages, if any, that would have been minimized or avoided.

The jury found that Homax misappropriated trade secrets as to the Jaws Clip but NPDG did not prove the misappropriation was the proximate cause of damages to NPDG. The special verdict form states, in pertinent part:

> 1.　Do you find the Plaintiffs have a trade secret in the Jaws Clip?
>
> 　　　　YES: __X__
> 　　　　NO: _____
>
> . . . .
>
> 2.　Did Defendant misappropriate Plaintiffs' Jaws Clip trade secret?
>
> 　　　　YES: __X__
> 　　　　NO: _____
>
> . . . .
>
> 3.　Were Plaintiffs damaged by Defendant's misappropriation of the Jaws Clip trade secret?
>
> 　　　　YES: _____
> 　　　　NO: __X__
>
> If you answered YES, then go to Question No. 4. If you answered NO, then sign and date the Jury Verdict Form and you are done.
>
> 4.　If you have found Defendant to be liable to Plaintiffs, what are the damages that Plaintiffs are entitled to recover from Defendant?

NPDG also contends substantial evidence does not support the jury's finding that there were no damages. NPDG argues the jury should have relied on the evidence of the sales figures for the Cinch Tite Clip, the manufacturing costs and sales figures for the Rhino Clip, and the cost of obtaining prototypes for the Jaws Clip to find that NPDG incurred damages from "lost business opportunities" and the costs of developing the Jaws Clip.

Overturning a jury verdict is appropriate only if "it is clearly unsupported by substantial evidence." Burnside v. Simpson Paper Co., 123 Wn.2d 93, 107-08, 864 P.2d 937 (1994). The substantial evidence test is met where there is sufficient evidence to persuade a rational, fair-minded person of the truth of the premise. Winbun v. Moore, 143 Wn.2d 206, 213, 18 P.3d 576 (2001). In reviewing the evidence, the appellate court cannot reweigh the evidence, draw its own inferences, or substitute its judgment for that of the jury. Burnside, 123 Wn.2d at 108.

On appeal, the party seeking review has the burden to perfect the record so that we have all relevant evidence before us. Bulzomi v. Dep't of Labor & Indus., 72 Wn. App. 522, 525, 864 P.2d 996 (1994). Here, NPDG designated only limited portions of the testimony at trial. But even the limited record on appeal shows substantial evidence supports the jury's verdict.

Cameron admitted at trial that NPDG never sold or patented the Jaws Clip.

Q  . . . . My question is you never sold a Jaws Clip; is that correct?
A  Just made prototypes.
Q  To this day in the year 2011 you have never sold a Jaws Clip; is that correct?
A  No. In 2004 we were stopped.
Q  You were stopped in 2004 from selling Jaws Clips?
A  Yes. My patent attorney when he saw that Homax had copied that patent and did it in there that they put the, what do you call it, they put the art out there, they had the art before we had a chance to file priority is what it is.
Q  Mr. Cameron, you have testified that the Jaws Clip was invented in 2001; is that correct?
A  Correct.
Q  So in 2001 you could have filed a patent application on the Jaws Clip; is that correct?
A  Didn't have the money.
Q  In 2002 you could have filed a patent application on the Jaws Clip?
A  Didn't have the money then. . . .
. . . .

Q  Mr. Cameron, on Friday you testified that you didn't file a patent application for the Jaws Clip because you didn't have money to do so; is that correct?

A  Correct.

Q  Did you have any investors give you money for the Jaws Clip?

A  Correct.

Q  Did a Mr. Massey give you money for the Jaws Clip?

A  Absolutely.

. . . .

Q  . . . . So the date of this agreement per Mr. Massey's signature is December 29, 2000; is that correct?

A  Correct.

Q  And Mr. Massey provided $10,000 in cash for the investment in the Jaws Clip; is that correct?

A  Correct. . . .

Q  . . . . This agreement states that the Jaws Clip is to be patented and prototyped. Do you see that, Mr. Cameron? I can point to it up here, sort of in the middle of the paragraph it says to be patented and prototyped?

A  Correct.

Q  Do you see the next sentence, Mr. Cameron, where it says Todd Andersen and Mac Cameron agree to pay for patent and prototype model?

A  Correct.

Q  That didn't happen, Mr. Cameron?

A  Yes, it did.

Q  You said there was never a patent filed.

A  No, not the patent. But the prototype and all the other costs.

Q  This agreement says that Mr. Andersen and Mr. Mac Cameron agree to pay for a patent; is that correct?

A  Correct.

Q  And that didn't happen?

A  No, not at that time.

Q  But it's never happened, there's never been a Jaws patent application filed; is that correct?

A  No. We filed disclosures for the patent office.

Q  You filed a disclosure with your patent attorney?

A  Correct.

Q  But you have never filed a patent application with the United States Patent Office for the Jaws Clip?

A  No. No.

Q  Yet Friday you stated you had no money to do that; is that correct?

A  Correct.

. . . .

24

> Q      So you took on the responsibility of marketing the Jaws Clip and promised Mr. Massey you would do that in return for the investments; is that correct?
>
> A      Correct.
>
> Q      You haven't done that?
>
> A      Well, we have done marketing, we have done art, we have done prototyping.
>
> Q      You have never offered the Jaws Clip for sale to a third party; is that correct?
>
> A      Only Homax.
>
> Q      And you have never, sitting here today in 2011, sold the Jaws Clip; is that correct?
>
> A      No.  We haven't got it.  We've got it prototyped and we have a manufacturer.

Cameron also testified that NPDG has never sold a Rhino Clip to a "big box" store.

> Q      You testified that you had a Mr. Heininger who had promised you big box retail sales of Rhino Clips; is that correct?
>
> A      You bet.
>
> Q      And to this date in 2006, 2007, 2008, 2009, 2010, Mr. Heininger has not achieved big box retail sales for you?
>
> A      . . . . I never responded to him.

We conclude substantial evidence supports the jury's finding that NPDG did not prove it was entitled to damages.[16]

CR 11 Sanctions

NPDG argues the trial court abused its discretion in awarding the attorney fees Homax incurred in defending against the Rhino Clip trade secret claim under CR 11.

Homax sought $57,120 in attorney fees.  $5,490 in attorney fees for summary judgment, and $51,630 in attorney fees for defending the breach of contract and unjust enrichment claims at trial.  The court awarded Homax $4,500 in attorney fees in obtaining dismissal of the trade secret claims as to the Rhino Clip.

---

[16] Because we conclude the jury verdict is supported by substantial evidence, the trial court did not err in also ruling NPDG was not entitled to damages for its equitable claims for damages.

Under CR 11, the court may impose sanctions if pleadings are filed for an improper purpose or without a basis in law or fact. Biggs v. Vail, 124 Wn.2d 193, 201, 876 P.2d 448 (1994). We review the trial court's CR 11 ruling for an abuse of discretion. Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wn.2d 299, 338, 858 P.2d 1054 (1993).

The existence of a trade secret requires "efforts that are reasonable under the circumstances to maintain its secrecy." RCW 19.108.010(4). Cameron testified at his deposition that he widely distributed samples of the Rhino Clip, and in 2001, submitted a patent application disclosing the features of the Rhino Clip. In opposition to summary judgment, NPDG conceded it did not have a cause of action under the trade secrets act with respect to the Rhino Clip. The trial court did not abuse its decision by awarding Homax attorney fees under CR 11. See MacDonald v. Korum Ford, 80 Wn. App. 877, 885-88, 912 P.2d 1052 (1996) (CR 11 sanctions appropriate where counsel failed to withdraw claims after it became clear following his client's deposition that claims lacked legal or factual basis).

We affirm in all respects.

WE CONCUR: