**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
FEBRUARY 15, 2024

*González, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
FEBRUARY 15, 2024

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| STAN SCHIFF, MD, PhD, on behalf of himself and a class of similarly situated providers, ) ) ) ) | No. 101576-3 |
| Respondent, ) ) | En Banc |
| v. ) ) | |
| LIBERTY MUTUAL FIRE INSURANCE COMPANY and LIBERTY MUTUAL INSURANCE COMPANY, foreign insurance companies, ) ) ) ) ) | Filed: February 15, 2024 |
| Petitioners. ) ) | |

JOHNSON, J.—This case looks at what an insurer must do to meet the "reasonable investigation" requirement and the requirement to pay "all reasonable and necessary" medical expenses under the personal injury protection (PIP) statutes, ch. 48.22 RCW; accompanying regulations; and the Washington

Consumer Protection Act (CPA), ch. 19.86 RCW. WAC 284-30-330(3); RCW 48.22.005(7).

Dr. Stan Schiff brought a class action suit claiming the practice of reducing provider bills to an 80th percentile cap based on a computer-generated calculation violated the CPA. Schiff argues that the formulaic approach violates the PIP statutory requirement to pay "'*all* reasonable and necessary'" medical expenses and is not a reasonable investigation, resulting in a violation of Washington's CPA. Resp. of Resp't Dr. Schiff to Liberty Mut.'s Pet. for Rev. at 1-2 (emphasis added). Liberty Mutual Fire Insurance Company and Liberty Mutual Insurance Company (collectively Liberty) contend that the statutory requirement to conduct a reasonable investigation into medical expenses is satisfied by determining the 80th percentile of charges for a treatment in the geographic area and is not an unfair practice under the CPA. The trial court denied both Schiff's and Liberty's summary judgment motions. The Court of Appeals reversed as to Schiff. *Schiff v. Liberty Mut. Fire Ins. Co.*, 24 Wn. App. 2d 513, 520 P.3d 1085 (2022), *review granted*, 1 Wn.3d 1001 (2023). We reverse the Court of Appeals in part and hold that Liberty's 80th percentile practice is not an unfair practice under Washington's CPA.[1]

---

[1] Liberty also challenges the Court of Appeals' rejection of the two affirmative defenses raised: the safe harbor defense, based on the Office of the Insurance Commissioner's approval of the policy and an exemption in the CPA statute, and the good faith defense, based on

FACTS AND PROCEDURAL HISTORY

Liberty provides PIP and MedPay (supplemental medical payment coverage) policies to insureds in Washington State. When Liberty receives a medical bill for a policyholder, Liberty uses a third-party database called FAIR Health to determine the reasonableness of the medical provider's charges. FAIR Health is an independent, nonprofit, national medical claim database. FAIR Health allows insurers to compare providers' charges for specific treatments in a geographical area and determine different percentiles of those charges. Under Liberty's bill review practice, if a medical provider's bill is below the 80th percentile for the area, Liberty pays the bill in full. If the provider's charge exceeds the 80th percentile benchmark, the payment is reduced to that amount.

Over several years, Schiff submitted 20 treatment bills to Liberty. Based on Liberty's bill review practice, 2 of Schiff's bills were reduced to the 80th percentile. A 2015 bill was originally $380.00 and was reduced to $339.00. A 2016 bill was originally $945.00 and was reduced to $841.73. The total reduction was $144.27.

---

Washington CPA case law. Because of our holding, we need not analyze the two defenses raised by Liberty.

On May 8, 2017, Schiff sued individually and on behalf of similarly situated Washington health care providers, alleging that Liberty's practice of reducing payments to medical providers was a violation of Washington's PIP statutes, the WACs, and Washington's CPA. Schiff sought class certification, damages, prejudgment interest, attorney fees, and litigation expenses. In an amended complaint, Schiff also requested that Liberty be enjoined from making reductions to providers' bills and from not conducting a reasonable investigation of a bill before refusing to pay in full. Liberty asserted defenses that their conduct is protected by the CPA "'safe harbor'" defense, set forth in RCW 19.86.170, and/or by the "'good faith'" exception to CPA liability established under Washington case law. Clerk's Papers at 4159.

Both parties filed for summary judgment as to whether Schiff had legal standing to bring the class action and individual claims alleged in his pleadings, or whether he was barred from asserting those claims based on the settlement agreement in an Oregon case, *Froeber v. Liberty Mutual Insurance Co.*, 222 Or. App. 266, 193 P.3d 999 (2008). The trial court concluded that the class action settlement barred Schiff from asserting the class action claims, but did not bar him from pursuing his individual CPA claim for monetary damages based on the two bill reductions.[2]

---

[2] The decision on the class action claim has not been appealed.

Schiff then motioned for partial summary judgment on liability based on the Court of Appeals' decision in *Folweiler Chiropractic, PS v. American Family Insurance Co.*, 5 Wn. App. 2d 829, 429 P.3d 813 (2018), which the trial court denied. The court outlined the undisputed facts, including stipulations that (1) Liberty relied solely on its 80th percentile bill review methodology to review and reduce the payment on Schiff's 2015 and 2016 bills and (2) Liberty did not do individualized investigations with respect to those bills. The trial court ultimately denied summary judgment because there were genuine issues of material fact as to whether Liberty's conduct is protected by the CPA "safe harbor" defense or the "good faith" exception to CPA liability. Included in that factual dispute is whether the Office of the Insurance Commissioner (OIC) affirmatively approved Liberty's methodology and whether Liberty acted in compliance with whatever approval the OIC gave. The trial court also denied both parties' subsequent cross motions for summary judgment.

Both parties sought discretionary review of the trial court's denial of summary judgment in the Court of Appeals. The Court of Appeals granted review. The trial court stayed the case pending the outcome of their motions for discretionary review. In a published opinion, the Court of Appeals reversed the trial court's denial of Schiff's motion for summary judgment and affirmed the trial court's denial of Liberty's motion for summary judgment. *Schiff*, 24 Wn. App. 3d

at 547. The court reasoned that under *Folweiler*, an insurer engages in an unfair

practice by failing to conduct an individualized assessment of the reasonableness

of a medical provider's bill. *Schiff*, 24 Wn. App. 2d at 526. The court noted that

RCW 48.22.095(1)(a) and RCW 48.22.005(7) require "an individualized

assessment rather than substituting a formulaic approach that pays only 80 percent

of the average charge for a large geographic area." *Folweiler*, 5 Wn. App. 2d at

838. Liberty then sought this court's review,[3] which we granted.[4]

## ISSUE

Whether Liberty's use of the FAIR Health database and the 80th percentile

practice to determine the reasonableness of medical providers' bills violates the

Washington CPA.[5]

## ANALYSIS

This court reviews orders on summary judgment de novo. We engage in the

same inquiry as the trial court. "'Summary judgment is proper where there are no

---

[3] Schiff filed an answer opposing review. Amici briefs supporting review were filed by the American Property Casualty Insurance Association (APCIA) and Mitchell International Inc. (Mitchell).

[4] Mitchell, APCIA, FAIR Health Inc., and the United States Chamber of Commerce submitted amici briefs for Liberty. The Washington State Association for Justice Foundation, the Northwest Consumer Law Center, the attorney general of the State of Washington, and the Washington State Chiropractic Association submitted briefs supporting, to a limited extent, Schiff.

[5] The petition for review presented four issues. Issue one asked whether the Court of Appeals' decision conflicted with Washington insurance law, and issue two asked whether Schiff met the elements of a CPA claim. The issues present the same analysis and arguments, and are therefore combined under issue one in this opinion. We decline to address the two additional issues regarding affirmative defenses that Liberty raised.

genuine issues of material fact and the moving party is entitled to judgment as a matter of law.'" *Kut Suen Lui v. Essex Ins. Co.*, 185 Wn.2d 703, 710, 375 P.3d 596 (2016) (quoting *Durland v. San Juan County*, 182 Wn.2d 55, 69, 340 P.3d 191 (2014)); *see* CR 56(c). This case also concerns statutory interpretation, which is a question of law that is reviewed de novo. This court's objective in determining statutory meaning is to carry out the legislature's intent. We look at the act as a whole and give effect to all of the language. If the statute is plain on its face, then we give effect to its plain meaning. If the statute is ambiguous, it is subject to judicial construction. *Durant v. State Farm Mut. Auto. Ins. Co.*, 191 Wn.2d 1, 8, 419 P.3d 400 (2018).

Schiff argues that the Court of Appeals' decisions in *Folweiler* and this case should be affirmed. He states that Liberty's 80th percentile practice violates the PIP requirements and thus violates the CPA. Schiff's assertion is that Liberty's 80th percentile practice is not a "reasonable investigation" into medical charges, and Liberty has failed to pay "all reasonable and necessary expenses." Resp. of Resp't Dr. Schiff to Liberty Mut.'s Pet. for Rev. at 2, 17, 12. Liberty counters that its use of FAIR Health and the 80th percentile practice is reasonable based on the language of the insurance code and WAC regulations, which do not mandate the individual provider inquiry that Schiff desires. Since the investigation is reasonable, there is no PIP violation and thus no CPA violation.

The primary question before us thus centers on what is the meaning of "reasonable" in the context of the PIP statutes. Ch. 48.22 RCW. We must determine whether an objective formulaic review process can meet the requirements of reasonable investigation, who decides whether an action is reasonable, and whether any limits exist on a general formula used by insurers.

Starting with the CPA, Washington's version was adopted by the legislature in 1961 and codified at chapter 19.86 RCW. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 783, 719 P.2d 531 (1986). RCW 19.86.020 provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." The legislature's purpose in adopting the CPA was "to protect the public and foster fair and honest competition," with further direction that "[t]o this end[,] this act shall be liberally construed that its beneficial purposes may be served." RCW 19.86.920. The intent to protect the public and competition is balanced with an intent to protect legitimate business: "this act shall not be construed to prohibit acts or practices which are reasonable in relation to the development and preservation of business or which are not injurious to the public interest." RCW 19.86.920.

Later, the legislature amended the CPA to provide for a private right of action, allowing citizens to bring suits to enforce the CPA and acquire damages

and other fees for CPA violations. *Hangman Ridge*, 105 Wn.2d at 784. The

statutory basis for private claims provides that

> [a]ny person who is injured in his or her business or property by a
> violation of RCW 19.86.020 . . . may bring a civil action in superior
> court to enjoin further violations, to recover the actual damages
> sustained by him or her, or both, together with the costs of the suit,
> including a reasonable attorney's fee.

RCW 19.86.090. The legislature has also provided that violations of insurance

regulations are subject to the CPA, though nothing permitted to be done by the

insurance code, Title 48 RCW, or by the regulating agency, can be a CPA

violation. RCW 19.86.170.

Our case law has developed an applicable framework on how CPA claims

are analyzed. In *Hangman Ridge*, we adopted five elements that must be

established by a plaintiff in order to prevail under a private CPA action: (1) an

unfair or deceptive act or practice (2) in trade or commerce, (3) which affects the

public interest, (4) an injury to plaintiff's business or property, and (5) a causal link

between the unfair or deceptive act or practice and the injury. 105 Wn.2d at 784-

85. As to the first element, we have noted that "'[b]ecause the act does not define

"unfair" or "deceptive," this court has allowed the definitions to evolve through a

"gradual process of judicial inclusion and exclusion."'" *Klem v. Wash. Mut. Bank*,

176 Wn.2d 771, 785, 295 P.3d 1179 (2013) (alteration in original) (quoting

*Saunders v. Lloyd's of London*, 113 Wn.2d 330, 344, 779 P.2d 249 (1989)).

Whether an act or practice qualifies as unfair or deceptive is a question of law. *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 47, 204 P.3d 885 (2009).

In *Klem*, we clarified that "a claim under the Washington CPA may be predicated upon a per se violation of statute, an act or practice that has the capacity to deceive substantial portions of the public, or an unfair or deceptive act or practice not regulated by statute but in violation of public interest." 176 Wn.2d at 787. Part of Liberty's argument is that Schiff has made a per se claim, which he lacks standing to bring as a noninsured. *See Tank v. State Farm Fire & Cas. Co.*, 105 Wn.2d 381, 394, 715 P.2d 1133 (1986). While a third-party noninsured lacks standing to bring a per se CPA violation claim, a statutory violation can demonstrate that an action violates public policy and is unfair for the purposes of a non-per-se-CPA violation. *See Klem*, 176 Wn.2d at 787. Further, this court has liberally construed the requirements of pursuing a CPA violation claim, and we have declined to add an element of standing. *Panag*, 166 Wn.2d at 38. Schiff thus has standing to bring a non-per-se-CPA action as a third-party noninsured.

Turning to the first *Hangman Ridge* element, Schiff must show that the act or practice in question is unfair. In examining fairness, we are directed to the PIP statutes. RCW 48.22.095(1)(a) states that insurers offering auto insurance policies must offer minimum personal injury protection of at least $10,000 for medical and hospital benefits. RCW 48.22.005(7) states that "'[m]edical and hospital benefits'

means payments for all reasonable and necessary expenses." WAC 284-30-330 outlines specific unfair claims settlement practices. One such practice is "[f]ailing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies." WAC 284-30-330(3). Another is "[r]efusing to pay claims without conducting a reasonable investigation." WAC 284-30-330(4). The standards for prompt, fair, and equitable settlements provide that an insurer must determine whether medical and hospital services are (1) not reasonable, (2) not necessary, (3) not related to the accident, or (4) not incurred within three years of an accident, and insurers must provide notification of such determinations. WAC 284-30-395(1).

Based on these statutes and regulations, the Court of Appeals in *Folweiler* held that American Family's claims evaluation process, the same process that Liberty uses here, may constitute an unfair practice under the CPA. 5 Wn. App. 2d at 838. The Court of Appeals interpreted the PIP requirement to pay "all reasonable and necessary expenses" as a requirement that insurers review each claim and provider through an individual assessment to determine what is reasonable and necessary before reducing payments, rather than using a formulaic approach. *Folweiler*, 5 Wn. App. 2d at 838. The individualized assessment should consider and independently evaluate "the identity, background, credentials, or experience or any personal characteristic of the individual provider or whether the

amount charged was reasonable for the individual treatment provided." *Folweiler*, 5 Wn. App. 2d at 838.

Though the Court of Appeals cited to the relevant statutes and regulations, it failed to explain how they mandate an inquiry into the qualifications of the medical provider and did not cite any cases to bolster its interpretation. The PIP statutes and the insurance code do not have any express requirement that the insurers look specifically at the qualifications of a medical provider to determine the reasonableness of the charge. By its language, the insurance code places the onus on *insurers* to determine whether to deny, limit, or terminate an insured's medical and hospital benefits if the *insurer* determines that the claim is not reasonable or necessary. Insurers are tasked with creating their own reasonable investigations and reasonable standards for prompt investigation of claims. Schiff's briefing also appears to acknowledge that under WAC 284-30-330, insurers are able to adjust medical charges, as long as the insurers conduct an investigation and determine whether the amount billed is unreasonable. Suppl. Br. of Resp't Dr. Schiff at 8.

The Court of Appeals also made a fundamental mathematical error in *Folweiler*, which it quoted again in its decision for this case, that Liberty's approach "'pays only 80 percent of the average charge for a large geographic area.'" *Schiff*, 24 Wn. App. 2d at 527 (quoting *Folweiler*, 5 Wn. App. 2d at 838). This is incorrect. Eighty percent of average is not equivalent to 80th percentile.

Percentile is determined by first ordering all data points (or bills as charged) from lowest to highest. The 80th percentile of that set of data is the value at which 80 percent of data points fall below it. Under the 80th percentile practice, 80 percent of the bills at the low end are paid in full automatically. Only the highest 20 percent of bills are reduced to the 80th percentile level. Stated another way, if there were 10 total charges ordered from lowest to highest (numbered 1-10), the 8 lowest charges would be paid in full, and only the 2 highest bills (if higher than the 8th) would be reduced to the amount of the 8th charge.

Schiff argues this court's holding in *Durant* supports the Court of Appeals' reasoning here, but *Durant* did not speak to this practice. Rather, *Durant*'s holding was that the plain language of WAC 284-30-395 prohibits the addition of "maximum medical improvement" as grounds for the denial, limitation, or termination of medical benefits because the statute provides specific and limited grounds for what can be considered—not reasonable, not necessary, not related to the accident, or not incurred within three years of the automobile accident. *Durant*, 191 Wn.2d at 18-19. Unlike the insurer in *Durant*, Liberty has not created any additional grounds for denial, limitation, or termination of medical benefits. Liberty's review process can be characterized as a way to determine "reasonableness" through comparison to other charges for the same treatment in the same geographic area.

The FAIR Health database sets reasonableness on a scale by ordering submitted claims by amount and providing various percentile markers. Schiff argues that specific factors about providers must be incorporated into the review process, but FAIR Health incorporates certain factors inherently. For example, FAIR Health calculates the compensation for a doctor's experience by including *all* bills submitted to insurance providers in a given area.

Though some concerns have been expressed that the 80th percentile practice and the use of FAIR Health may result in treatment charges being reduced over time, this would not occur based on anything within the control of FAIR Health. The FAIR Health database contains claim bills *as charged*, not as paid. The market controls the 80th percentile and the range of charges. The market range can shift, but neither Liberty nor FAIR Health have the ability to shift the charged amount downward. More likely, the scale will naturally shift upward over time if and when providers increase their charges.

The relevant subsections of the WAC, 284-30-330(3) and (4), require insurers to adopt reasonable standards and a reasonable investigation into claims. Comparing charges for the same treatment in the same geographic area is relevant to the determination of reasonableness. We conclude that the use of FAIR Health and the 80th percentile practice is not universally unfair by CPA requirements.

Finally, our conclusion is supported by decisions from other jurisdictions, where the 80th percentile practice, and variations of it, have been upheld. Cases about this practice involve use of the Ingenix database, a predecessor to FAIR Health. In *Lebanon Chiropractic Clinic, PC v. Liberty Mutual Insurance Co.*, No. 5-15-0111, 2016 IL App (5th) 150111-U, 2016 WL 546909 (Feb. 9, 2016) (unpublished), the court reviewed a class action settlement between Lebanon and Liberty after one of the plaintiff doctors from Washington argued that the settlement was unfair to Washington plaintiffs, and the court concluded that the settlement was fair, reasonable, and adequate. Under that settlement, Liberty could continue to use the FAIR Health database and the 80th percentile practice. *Lebanon*, 2016 WL 546909, at *5. That court also referenced a settlement in Washington between a Dr. Kerbs and Safeco, now a subsidiary of Liberty, in which a Washington court concluded that the use of the FAIR Health database and an 85th percentile practice did not breach any duty under applicable Washington law, which was part of the *Lebanon* court's conclusion that Washington law would not have provided the plaintiff any additional protections. In *Chan Healthcare Group PS v. Liberty Mutual Fire Insurance Co.*, 192 Wn.2d 516, 523, 431 P.3d 484 (2018), we reviewed whether the *Lebanon* settlement from Illinois should be given full faith and credit, and noted that "[a]lthough differences do exist between

Illinois and Washington consumer protection laws, the elements of a claim under them are nearly identical and the relief available is roughly the same."

The practice was reviewed by the Delaware Supreme Court in *GEICO General Insurance Co. v. Green*, 276 A.3d 462, 2022 WL 1052195 (Del. 2022) (unpublished). There the court considered whether GEICO's 80th percentile practice using the FAIR Health database violated the state's PIP statute, DEL. CODE ANN. tit. 21, § 2118. It held no violation occurred. The court noted that section 2118(a)(2) requires insurers to compensate reasonable and necessary medical expenses, the claimant did not demonstrate that the use of the practice and of FAIR Health violated the statute, and the claimant failed to show that the original medical expenses were reasonable and necessary.

## CONCLUSION

We hold that the 80th percentile practice and the use of the FAIR Health database is not unfair or unreasonable and does not violate the CPA or the PIP requirements to establish standards under which reasonable charges for medical procedures are determined. The Court of Appeals' decision is reversed and the case remanded to the trial court to enter a summary judgment order in favor of Liberty.

_____
Johnson, J.

WE CONCUR:

_____
Gordon McCloud, J.

_____
Madsen, J.

_____
Yu, J.

_____
Owens, J.

_____
Montoya-Lewis, J.

_____
Whitener, J.

No. 101576-3

STEPHENS, J. (dissenting)—Washington's personal injury protection (PIP) statutes require automobile insurers to cover "all reasonable and necessary [medical] expenses" incurred by an insured "as a result of an automobile accident." RCW 48.22.095(1)(a), .005(7). Our Consumer Protection Act (CPA) requires insurers to "implement reasonable standards" and "conduct[] a reasonable investigation" into claims. WAC 284-30-330(3), (4). The question in this case is whether Liberty's *sole reliance* on the FAIR Health database to determine if a provider's charge is reasonable satisfies these statutory mandates. It does not. While I agree with the majority that "[c]omparing charges for the same treatment in the same geographic area is relevant to the determination of reasonableness," majority at 14, Liberty has not shown that its application of an 80th percentile rule using the FAIR Health database constitutes a reasonable investigation into a specific charge or establishes that a provider's charge is unreasonable. It is entirely possible that patients may incur *reasonable* medical expenses greater than the 80th percentile benchmark in a

1

given geographic area, and Liberty does not demonstrate how FAIR Health provides sufficient information to categorically reject all charges above the 80th percentile. I would affirm the Court of Appeals' holding that Liberty's sole reliance on its 80th percentile rule violates the PIP statutes and therefore constitutes an unfair practice under the CPA. I would also reject Liberty's asserted affirmative defenses.

DISCUSSION

Let me begin by clearly stating what is *not* at stake in this case. Contrary to some elevated rhetoric in the briefing, a decision allowing Dr. Stan Schiff's CPA claim to go forward does not signal the end of insurance companies' ability to use billing databases in meeting their obligations under the PIP statutes. Databases such as FAIR Health provide a useful tool that can help insurers timely process medical claims. But the key word is "help." The question is whether Liberty's sole reliance on the database and its chosen percentile cutoff constitutes a reasonable investigation and is sufficient to determine that a provider's charge is not reasonable.

Liberty stipulated below that it relies solely on FAIR Health to compare providers' charges for a specific treatment in a given geographic area. Majority at 3-5. Liberty pays charges up to the 80th percentile for bills in the area; higher charges are automatically reduced to the 80th percentile. *Id.* FAIR Health delineates a provider's geographic area based on the "geozip," which it defines as the first three digits of the provider's zip code. Though Liberty checks the "accuracy of the data

2

on the bill . . . and what is being charged for . . . from a service standpoint," it does not further inquire into the reasonableness of a specific provider's charges. Clerk's Papers at 1351-52; *see also* Verbatim Rep. of Proc. (Feb. 28, 2020) at 125. Stated in terms of Liberty's obligations under the PIP statutes, Liberty determines that the amount of a bill is categorically *unreasonable* if it exceeds the 80th percentile in the relevant geographic area. This truncated basis for determining reasonableness fails for the same reason this court held the "maximum medical improvement" methodology at issue in *Durant* failed: it is "clearly more restrictive" than the ordinary meaning of "reasonable" requires. *Durant v. State Farm Mut. Auto. Ins. Co.*, 191 Wn.2d 1, 12, 419 P.3d 400 (2018).

Liberty's sole reliance on FAIR Health to determine maximum reimbursement rates for medical bills does not comport with the legislative mandate to pay all reasonable and necessary expenses under the PIP statutes. This conclusion follows from what we have previously said about reasonableness in this context. In *Durant*, we explained that "reasonable" in the PIP context must be given its "ordinary (dictionary) definition" in the absence of a statutory definition: "'not conflicting with reason **:** not absurd **:** not ridiculous . . . being or remaining within the bounds of reason **:** not extreme **:** not excessive.'" 191 Wn.2d at 12 n.3 (alteration in original) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1892 (2002)). Under this commonsense definition, we held that State Farm's maximum

3

medical improvement standard to determine payment of PIP claims was "clearly more restrictive than what would ordinarily be considered reasonable . . . medical care." *Id.* at 12. The majority attempts to distinguish *Durant* based on the fact that a different WAC was at issue in that case and that the specific concept used by the insurer was "maximum medical improvement" rather than a percentile rule for determining the reasonableness of charges. Majority at 13; *see* 191 Wn.2d at 14. But this purported distinction misses the essential point in *Durant*: the PIP statutes require an insurer to pay all reasonable and necessary medical bills and do not allow reliance on "additional criterion that must be met for medical payments." 191 Wn.2d at 9. Liberty essentially substitutes a bright line 80th percentile cutoff for a reasonable investigation, and it makes no attempt to determine if a charge above the 80th percentile in a geozip area is, in fact, unreasonable. Liberty's categorical reduction of any charge over the 80th percentile as "unreasonable" is too restrictive a measure, just as in *Durant*.[1]

---

[1] Nothing in the record suggests that Liberty's decision to reduce medical charges after the 80th percentile, as opposed to some other threshold, marks the outer limit of what is reasonable. Safeco, a subsidiary of Liberty, uses the 85th, rather than the 80th, percentile to reduce charges. Wash. Sup. Ct. oral arg., *Schiff v. Liberty Mut. Fire Ins. Co.*, No. 101576-3 (Sept. 26, 2023) at 33 min., 59 sec., *video recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org/; *see also Lebanon Chiropractic Clinic, PC v. Liberty Mut. Ins. Co.*, No. 5-15-0111, 2016 IL App (5th) 150111-U, 2016 WL 546909, at *3 (Feb. 9, 2016) (unpublished). The majority offers no explanation for why a charge that is reasonable under another insurer's percentile rule is nonetheless unreasonable under Liberty's rule. There is no articulated principle of "reasonableness"

4

Consistent with *Durant*, the Court of Appeals in *Folweiler* held that an insurer's reliance on FAIR Health to assess whether medical provider bills are reasonable within the meaning of the PIP statutes constitutes an unfair practice under the CPA. *Folweiler Chiropractic, PS v. Am. Fam. Ins. Co.*, 5 Wn. App. 2d 829, 429 P.3d 813 (2018). The majority recognizes that *Folweiler* is directly on point but refuses to credit its sound reasoning. Majority at 11-12. Instead, the majority erroneously recasts *Folweiler* as having added a requirement to the PIP statutes by mandating consideration of a provider's credentials and qualifications in determining reasonableness. *Id.* (stating *Folweiler* "express[ly] require[s] that the insurers look specifically at the qualifications of a medical provider to determine the reasonableness of the charge"). But that aspect of the Court of Appeals opinion referred to the specific "allegations in Folweiler's complaint"—that the company did not "consider and independently evaluate the identity, background, credentials, or experience or any personal characteristic of the individual provider or whether the amount charged was reasonable for the individual treatment provided"—and the court held those allegations were "*sufficient* to establish an unfair act in violation of the CPA." *Folweiler*, 5 Wn. App. 2d at 838 (emphasis added). The court simply included individual providers' characteristics as one example of relevant factors that

under the majority's analysis that prevents an insurer from dropping its percentile threshold to the 75th percentile, or to the 70th—or below.

5

may inform the reasonableness of an individual bill.  *Id.*  The actual holding in

*Folweiler* reflects the clear language of the PIP Statutes:

> The statutes necessarily impose a duty to look at each claim individually in order to determine the reasonable and necessary expenses for the insured. The law requires an individualized assessment rather than substituting a formulaic approach that pays only 80 percent of the average charge for a large geographic area.

*Id*. (emphasis omitted).[2]

Like the practice at issue in Folweiler, Liberty's practice involves no

individual assessment but instead applies "a geographic based formula to each claim

regardless of the individual circumstances."  *Id.* at 839.  This formula is too

restrictive to meet the PIP statute because the cost of a specific treatment will

inevitably vary based on each patient's condition, medical history, and living

circumstances, implicating treatment complexity, necessity, and urgency, among

other factors.  Indeed, the very use of a tool that collects and compares medical

---

[2] The majority also criticizes *Folweiler*, and in turn the Court of Appeals below, for "a fundamental mathematical error" that conflates distinct concepts of percentage and percentile.  Majority at 12.  This is a distraction.  A close reading suggests the *Folweiler* court's use of the term "percent" rather than "percentile" was likely an inadvertent misstatement.  5 Wn. App. 2d at 837-38.  In the opinion's description of the insurer's practices, the court accurately describes FAIR Health's process in arriving at the 80th percentile billing benchmark.  *See id.* at 833-34.  Though it later uses the term percentage, the court's holding does not depend on whether the insurance company paid 80 percent of a provider's charges or paid bills in full up to the 80th percentile for billing in the geozip area.  The essential point remains that an automatic reduction of bills to a percentile benchmark, lacking any individual assessment of reasonableness, violates the PIP statutes and therefore is an unfair practice under the CPA.  *Id.* at 839.

charges acknowledges that a range of charges is to be expected. Liberty concludes that charges above the 80th percentile are, per se, unreasonable, but it does not show any process for evaluating the reasonableness of a provider's charge beyond a bare comparison of charges. And, then it focuses only on the reasonableness of charges at the high end, without any analysis of the comparator charges—what if charges in the bottom 20th percentile are unreasonably low? This is the problem with rote application of a percentile benchmark based on a general data set; it fails to account for the possibility that some patients may require treatment that—perhaps due to the patient's health profile or urgency—costs more or less than the insurer's selected benchmark maximum. In fact, the majority seems to acknowledge that other factors are necessary to evaluate a bill's reasonableness, stating that FAIR Health "incorporates certain factors inherently," such as "the compensation for a doctor's experience by including *all* bills submitted to insurance providers in a given area." Majority at 13-14. But Liberty has not demonstrated that it evaluates any additional, relevant factors in bills greater than the 80th percentile (or in lower bills, for that matter). We should endorse the holding in *Folweiler* under which Liberty's practice is inconsistent with the PIP statutes and cannot survive CPA scrutiny. Liberty's sole reliance on FAIR Health's 80th percentile benchmark violates the PIP statutes' requirement that it pays insureds "*all reasonable*" medical charges. RCW 48.22.005(7) (emphasis added).

7

Additionally, it is unrealistic to suppose that Liberty's reliance on FAIR Health and its 80th percentile rule has no impact on medical costs. No one disputes that insurers have been relying increasingly on databases such as FAIR Health to adjust charges for medical care. Liberty lauds these tools as having a beneficial effect in controlling excess billing and providing timely payments, while Schiff insists that they distort and shrink the health care market. But while the parties point to the market effects of practices like Liberty's in the PIP context and beyond, the majority claims these practices have no effect. Majority at 14 (concluding any reduction in charges over time is not "based on anything within the control of FAIR Health" because the "database contains bills *as charged*, not as paid"). It is naive at best to pretend that insurance coverage limits and reimbursements do not inform providers' charges over time. Long used in determining usual and customary charges for out-of-network health care services, the introduction of such tools in the PIP context naturally shapes market behavior. Specifically, it directly links the concept of "usual and customary" charges in network-based health care coverage with the determination of a maximum reimbursement rate for providers submitting medical bills to PIP insurers. We should therefore closely examine Liberty's assertion that its practices help control costs.

Research commissioned by Alaska's Office of Management and Budget reveals that the 80th percentile rule, which Alaska had codified for health insurance

coverage,[3] puts upward pressure on health care costs and insurance premiums. MOUHCINE GUETTABI, INST. OF SOC. & ECON. RSCH. & DEP'T OF ECON. & PUB. POL'Y, UNIV. OF ALASKA ANCHORAGE, HOW HAS THE 80TH PERCENTILE RULE AFFECTED ALASKA'S HEALTH-CARE EXPENDITURES? 30 (2018),[4] (between 2004 and 2014, the 80th percentile rule has caused an 8.61 percent to 24.65 percent increase in health care expenditures in Alaska), https://www.commerce.alaska.gov/web/Portals/11/pub/INS_ISER_2018Study.80th Percentile.pdf [https://perma.cc/Z4EH-AER3]. The 80th percentile rule may serve as a "disincentive for providers to join insurance networks, [which] drives up the cost of insurance." *Id.* at 9. Effective January 2024, Alaska's Division of Insurance is repealing the 80th percentile rule. DIV. OF INS., DEP'T OF COM., CMTY. & ECON. DEV., 80TH PERCENTILE FREQUENTLY ASKED QUESTIONS (2023), https://www.commerce.alaska.gov/web/Portals/11/Pub/FAQ%2080th%20Percentile%20Regulation%2010.30.2023.pdf. In the repeal process, the Division of Insurance tracked the rate of change of FAIR Health's 80th percentile benchmark over four years for selected treatment codes in various jurisdictions, including Seattle, where it found a 13 percent increase. DIV. OF INS., DEP'T OF COM., CMTY &

---

[3] *See* 3 AAC 26.110(a)(2).
[4] The rule operates similarly to Liberty's 80th percentile methodology. GUETTABI, *supra*, at 4 ("As a result of the regulation, when charges for out-of-network care are billed to insurers, the insurers are required to pay an amount that is at least as much as the 80th percentile of billed charges for that service in that geographical area.").

ECON. DEV., COMPARISON OF FOUR YEAR 80TH PERCENTILE BILLED CHARGES (2018),

https://www.commerce.alaska.gov/web/Portals/11/pub/80thPercentileBilledCharges_2019.01.pdf.  Increases in the 80th percentile may reflect the fact that "providers can potentially increase their charges over time, and insurance company reimbursements have to keep pace with the cost increases."  GUETTABI, *supra*, at 9.

While the majority points to a few cases in other jurisdictions in support of its conclusion that Liberty's practice is fair and reasonable, majority at 14-15, Alaska's recent repeal of the 80th percentile rule indicates a rational, legitimate concern, backed by data, about using FAIR Health to determine reimbursement rates.  The use of databases and percentile benchmarks cannot be isolated from their effects, and for that reason, we should leave to policymakers the broader question of the circumstances under which they may appropriately be used.  We should focus on the clear statutory mandate for PIP reimbursement, which requires insurers like Liberty to show not the overall reasonableness of their practices, but that an individual provider's charge they refuse to pay is unreasonable, i.e. that it is "'absurd,'" "'ridiculous,'" or "'excessive.'"  *Durant*, 191 Wn.2d at 12 n.3 (quoting WEBSTER'S, *supra*, at 1892).

Because I would hold that Liberty's sole use of FAIR Health to determine charges' reasonableness violates the PIP statutes, it is necessary to consider Liberty's

10

affirmative defenses. I agree with the Court of Appeals' analysis and would affirm its holding that these defenses fail. First, in view of the minimal evidence in the record of any affirmative approval of the 80th percentile practice from the Office of the Insurance Commissioner, I would hold that Liberty does not meet the safe harbor exception in the CPA. And, because a good faith argument cannot exist in parallel with Liberty's per se CPA claim, I would hold that its good faith defense is irrelevant to this case.

CONCLUSION

Washington's PIP statutes require insurers to cover "all reasonable and necessary expenses" of an insured resulting from an automobile accident. RCW 48.22.095(1)(a), .005(7). Insurers have the authority to adjust medical charges, so long as they conduct a "reasonable investigation." WAC 284-30-330(3),(4). As we held in *Durant*, these mandates require an individual assessment of the reasonableness of an insured's medical bills, not reliance on a chosen proxy for "reasonableness." While I do not disagree that use of FAIR Health may provide information that is "relevant to the determination of reasonableness," majority at 14, Liberty's sole reliance on its 80th percentile rule violates the PIP statutes and constitutes an unfair practice under the CPA. I would affirm the Court of Appeals.

Stephens, J.

González, C.J.

11